[No. B079386. Second Dist., Div. One. May 31, 1995.]

KENDRA RYAN CAMP et al., Plaintiffs and Appellants, v. JEFFER, MANGELS, BUTLER & MARMARO, Defendant and Respondent.

622

**COUNSEL**

Nikki Tolt for Plaintiffs and Appellants.

Baker & Jacobson and Robert P. Baker for Defendant and Respondent.

**OPINION**

**MASTERSON, J.**—Plaintiffs appeal from a summary judgment disposing of their claims against defendant employer for wrongful termination of employment. They also seek reversal of an order compelling them to return certain documents to defendant. We affirm the judgment and the order.

## BACKGROUND

In 1983, plaintiffs Kendra and Ronald Camp, husband and wife, were indicted on several counts in the United States District Court for the Northern District of Oklahoma.[1] Count 1, a felony, charged the Camps with conspiracy to use false information for the purpose of defrauding a federally insured bank, and count 4 alleged that they falsely represented to a federally insured bank that they were medical doctors for the purpose of obtaining a loan. In 1984, the Camps entered guilty pleas to those two counts. On count 1, they were sentenced to 13 months' imprisonment; on count 4, they were placed on probation for 4 years, to commence upon release from prison. The Camps served approximately one year in prison before commencing probation. They violated the terms of probation, and the court sentenced them to additional prison time. The Camps were eventually released in 1987.

In or about September 1989, defendant Jeffer, Mangels, Butler & Marmaro (Jeffer Mangels) hired Mr. Camp on a temporary basis as a legal secretary. A month later, the firm offered him a permanent position, which he accepted. In July 1990, Mrs. Camp was hired by Jeffer Mangels, initially as a temporary legal secretary. She accepted an offer of permanent employment a month later.

The Camps each completed a job application that asked, among other things, if they had ever been convicted of a felony. They answered "no" to that question.[2] The Camps also submitted resumes that omitted any reference to their felony convictions and incarceration.[3]

Beginning in 1990, Jeffer Mangels became a contractor for the Resolution Trust Corporation (RTC). The RTC is an agency of the federal government, with responsibility for the sale and liquidation of savings and loan associations placed in receivership or conservatorship on or after January 1, 1989.

---

[1] Because this case comes to us on appeal from a summary judgment, we strictly construe the evidence offered by the moving party below (i.e., defendant) and liberally construe the evidence submitted by the opposing parties (i.e., plaintiffs). (See *Wagner* v. *Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1385 [265 Cal.Rptr. 412].)

[2] The Camps claim they did not believe they had been "convicted" of a felony because the charges against them were resolved through a plea bargain and because an attorney had advised them that their "convictions" were unconstitutional.

[3] Aside from those omissions, Jeffer Mangels contends that the Camps' resumes contained affirmative misrepresentations. More specifically, for the periods while the Camps were incarcerated, the resumes falsely indicated that they were employed as legal secretaries. Further, Mr. Camp claimed in his resume that he had attended a school in Oklahoma City, Oklahoma, while a resume to a different employer stated that the school was located in Tulsa. Finally, according to Mrs. Camp's resume, she received an MBA from a school called "Southwestern" located somewhere on the east coast. A private investigator retained by Jeffer Mangels was unable to find any such school.

As a condition of representing the RTC, Jeffer Mangels was required to certify periodically that none of its employees had ever been convicted of a felony. To comply with this certification process, the firm began asking new, permanent employees in 1990 to sign a form stating that they had not been convicted of a felony.[4] The form stated in part: "Jeffer, Mangels, Butler & Marmaro is a contractor for the Resolution Trust Corporation (RTC), an agency of the United States government. The Firm's contract with the RTC imposes certain fitness and integrity standards on all persons employed by the firm. Therefore, your truthful and appropriate completion of this form is a condition of employment with Jeffer, Mangels, Butler & Marmaro." Mrs. Camp completed and signed the form, stating under penalty of perjury that she had not been convicted of a felony.

Shortly after being hired, the Camps acknowledged in writing that their "employment is at will and can be terminated at any time with or without cause."

From July 1990 through March 1991, Mrs. Camp worked for Ron Goldie, a partner at Jeffer Mangels. In her deposition, Camp testified that Goldie told her that he was engaged in "insider trading," i.e., he was passing one client's confidential financial information to another client. She believed Goldie's conduct involved the possible purchase of stock, and she claims that Goldie was transmitting the client's confidential information without its consent. In Camp's words, Goldie "cautioned [her] very strongly not to reveal to any clients that he was feeding information to other clients." Camp reported Goldie's alleged insider trading to the director of human resources in late 1990 and to a member of the firm's management committee in February 1991.[5] In late March 1991, she was discharged. Jeffer Mangels told Mrs. Camp that she was being terminated because she had typed a letter for Goldie that contained excessive typographical errors. In her declaration opposing summary judgment, she denied having typed the letter.

Also in late March 1991, Jeffer Mangels discharged Mr. Camp, allegedly for using company time and resources to work on a personal matter. He denied any wrongdoing and claims he was discharged solely because he is married to Mrs. Camp.

In March 1992, the Camps filed the action below alleging four causes of action: (1) breach of an implied-in-fact contract; (2) breach of the covenant

---

[4]Mr. Camp apparently did not sign the RTC form, presumably because he was hired in 1989.

[5]Jeffer Mangels filed a declaration from Goldie unequivocally denying that he had engaged in insider trading. However, Mrs. Camp submitted sufficient evidence to establish that she *reasonably believed* he had committed such conduct.

of good faith and fair dealing; (3) wrongful termination in violation of public policy; and (4) misrepresentation. The first three causes of action were brought by both Camps; the final claim, for misrepresentation, was brought by Mrs. Camp alone.

During discovery, Jeffer Mangels learned that Mrs. Camp had retained copies of certain letters and memoranda between Goldie, on the one hand, and various clients and other attorneys of Jeffer Mangels, on the other hand. Jeffer Mangels moved the trial court for an order requiring the return of those documents. The court granted the motion.

It was also during the litigation that Jeffer Mangels first learned that the Camps had been convicted of a felony. After obtaining that information, the firm moved for summary judgment on the ground that, under the "after acquired evidence" doctrine, the Camps' claims were barred because they had secured employment through misrepresentations on their resumes and job applications. In the alternative, the motion sought summary adjudication on each cause of action.[6] The trial court granted the motion for summary judgment and also ruled in Jeffer Mangels's favor on the alternative grounds supporting summary adjudication of each claim. The Camps timely appealed from the judgment.

## DISCUSSION

The Camps contend that the trial court erred in granting summary judgment and in ordering them to return to Jeffer Mangels certain documents that Mrs. Camp removed from the office. We conclude that the Camps' at-will status bars their contract and misrepresentation claims and that the after-acquired-evidence doctrine bars their public policy claims. We further conclude that the trial court properly ordered the return of Jeffer Mangels's documents.

### A. *Summary Judgment Motion*

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

---

[6]The motion for summary adjudication reasserted the after-acquired-evidence argument for each cause of action. In addition, Jeffer Mangels argued that the first and second causes of action (breach of implied contract and breach of·the covenant of good faith and fair dealing, respectively) were without merit because the Camps were at-will employees. Summary adjudication on the third cause of action (violation of public policy) was also sought on the ground that no public policy had been violated. Finally, Jeffer Mangels argued that the fourth cause of action (misrepresentation) failed because Mrs. Camp did not reasonably rely on the alleged misrepresentations.

"A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed. . . ." (*Hanooka* v. *Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted.)

We independently review the trial court's determinations of law. "We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

### 1. *First Cause of Action (Implied-in-fact Contract)*

The first cause of action alleges that Jeffer Mangels made representations and engaged in conduct which created an implied-in-fact contract requiring good cause for termination. The Camps allege that they were discharged in violation of this implied agreement.

Labor Code section 2922 provides in part that "[a]n employment, having no specified term, may be terminated at the will of either party." That statute "establishes a presumption of at-will employment if the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination." (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373].) The at-will presumption may be overcome by evidence that the employer and employee impliedly agreed to termination only for cause. Factors creating such an implied agreement include " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " (*Id.* at p. 680, quoting *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327 [171 Cal.Rptr. 917].)

In moving for summary judgment, Jeffer Mangels submitted the Camps' signed acknowledgment forms on which they agreed that their employment was at will. The Camps' allegation of an *implied* contract

requiring good cause for termination is obviously in conflict with their *express* statements on the acknowledgment forms.

■ "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." (*Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613], criticized on other grounds in *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 688.) The express term is controlling even if it is not contained in an integrated employment contract. (*Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 272 [235 Cal.Rptr. 279] ■ Thus, the Camps' express at-will agreement precluded the existence of an implied contract requiring good cause for termination.

Alternatively, the evidence established as a matter of law that no implied contract existed. In that regard, the Camps did not rely on the factors typically used in proving the existence of an implied-in-fact contract. (See *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 680 [discussing factors].)

Instead, Mrs. Camp merely stated that after she complained about working for Mr. Goldie, Jeffer Mangels attempted to find her another position within the firm. Even assuming that the firm "promised" to place Mrs. Camp elsewhere, such a commitment would not alter the presumed at-will nature of her employment; the alleged promise did not concern the possible grounds for termination or create a legitimate expectation of employment for any particular length of time.[7]

Nor was the Camps' at-will status altered by the fact that they switched from temporary to permanent secretarial positions. (See *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 678 ["a contract for permanent employment, for life employment, for so long as the employee chooses, or for other terms indicating permanent employment, is interpreted as a contract for an indefinite period terminable at the will of either party"].)

Finally, it is irrelevant that Mrs. Camp quit her prior employment to accept Jeffer Mangels's job offer. Although a job offer may give rise to a good cause termination standard if it includes assurances of long-term employment, a simple offer, without more, is not sufficient. (Cf. *McLain* v. *Great American Ins. Companies* (1989) 208 Cal.App.3d 1476, 1487 [256

---

[7]Actually, Mrs. Camp remained employed for almost a month after she stopped working for Goldie.

Cal.Rptr. 863] [affirming jury verdict for employee on claim of breach of implied-in-fact contract where employee left prior employment based on "promises of long-term advancement possibilities"].) Were it otherwise, every applicant employed at the time of an offer would be exempt from the at-will rule, a result inconsistent with Labor Code section 2922.

Thus, the trial court correctly held that the Camps' first cause of action was meritless as a matter of law.

2.  *Second Cause of Action (Breach of the Covenant of Good Faith and Fair Dealing)*

In their second cause of action, the Camps contend that Jeffer Mangels breached the covenant of good faith and fair dealing inherent in their alleged implied-in-fact contract. It is well established that " '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 684, quoting *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].)

Since the trial court properly found that there was no implied-in-fact contract requiring good cause for termination, Jeffer Mangels could not, and did not, breach the covenant of good faith and fair dealing by allegedly discharging the Camps without sufficient cause. "It is apparent that continuous employment is not a 'benefit of the agreement' where the employment relationship is strictly at will. . . . [¶] Simply stated, where the at-will employment relationship is terminated, the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." (*Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 547 [249 Cal.Rptr. 5].)

Accordingly, the trial court properly resolved the second cause of action in favor of Jeffer Mangels.

3.  *Third Cause of Action (Termination in Violation of Public Policy)*

Mrs. Camp alleges in the third cause of action that she was discharged for notifying Jeffer Mangels's management about Mr. Goldie's alleged insider

trading. Mr. Camp contends he was terminated solely because he is married to Mrs. Camp.[8]

### After-acquired-evidence Doctrine

█ In general, the after-acquired-evidence doctrine shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have led to the discharge in any event. Employee wrongdoing in after-acquired-evidence cases generally falls into one of two categories: (1) misrepresentations on a resume or job application; or (2) posthire, on-the-job misconduct. █ In moving for summary judgment, Jeffer Mangels argued that the Camps' misrepresentations on their resumes and job applications—discovered by the firm during the litigation—barred their claims as a matter of law.

The trial court agreed, relying on federal case law existing at the time. (See, e.g., *Summers* v. *State Farm Mut. Auto. Ins. Co.* (10th Cir. 1988) 864 F.2d 700 [employee's misconduct on the job, discovered after discharge, warranted summary judgment for employer on claims of age and religious discrimination]; *Washington* v. *Lake County* (7th Cir. 1992) 969 F.2d 250 [employee's failure to disclose prior criminal convictions on job application, discovered after termination, entitled employer to summary judgment on race discrimination complaint]; *Mathis* v. *Boeing Military Airplane Co.* (D.Kan. 1989) 719 F.Supp. 991 [employee's failure to disclose on job application that she had been discharged by prior employers and convicted of a felony entitled employer to summary judgment on claims of race and sex discrimination; employer did not learn about application misrepresentations until after discharge].)

While the present case was on appeal, the Court of Appeal decided *Cooper* v. *Rykoff-Sexton, Inc.* (1994) 24 Cal.App.4th 614 [29 Cal.Rptr.2d 642]. There, the employee (Cooper) alleged that his termination violated a statutory prohibition on age discrimination and breached an implied-in-fact contract and the covenant of good faith and fair dealing. During Cooper's deposition, the employer learned he had falsified his job application by (1) failing to disclose that two prior employers had fired him, and (2) misstating his employment history. The employer moved for summary judgment based on this after-acquired evidence. In support of its motion, the employer

---

[8]Although Mr. Camp's claim is denominated "wrongful termination in violation of public policy," the complaint suggests he is pursuing a statutory claim for marital status discrimination under the California Fair Employment and Housing Act (the FEHA) (Gov. Code, § 12900 et seq.). For purposes of this appeal, we assume that Mr. Camp is alleging a claim under the FEHA.

submitted the declaration of a company manager stating that Cooper would not have been hired had he accurately filled out the application. The trial court granted summary judgment.

The Court of Appeal reversed, stating: "Neither sound public policy nor the general law of contract dictates that an employee who can show that despite loyal and competent service he was fired without cause, in violation of a term of his employment contract—or because of his age, in violation of statute—nonetheless has forfeited all resulting legal remedies against his employer because of material misrepresentations he made years earlier in his employment application. Although resumé fraud is a serious social problem, so is termination of employment in violation of antidiscrimination laws or in breach of contract. . . . Where an employer has fired a worker in violation of a statutory ban on discrimination in the workplace, the purpose and effect of the antidiscrimination statutes are unacceptably undermined by a principle that would allow a fact that played no part in the firing decision to bar any recovery." (24 Cal.App.4th at pp. 618-619.)

The court in *Cooper* left open the possibility that after-acquired evidence might bar recovery in some cases. It commented that many of the decisions granting summary judgment based on job application misrepresentations had "probably reached the correct result on their facts." (24 Cal.App.4th at p. 616.) The court also stated that it was "declin[ing] to adopt a blanket rule that material falsification of an employment application is a complete defense to [an employee's] claim" (*id.* at p. 617), thus suggesting that after-acquired evidence might limit or bar an employee's claims in some situations.[9]

More recently, the United States Supreme Court held in *McKennon v. Nashville Banner Pub. Co.* (1995) __ U.S. __ [130 L.Ed.2d 852, 115 S.Ct. 879] that after-acquired evidence does not shield an employer from liability under the Age Discrimination in Employment Act (the ADEA) (29 U.S.C. § 621 et seq.), although it may limit the type and extent of relief available to a prevailing plaintiff. (__ U.S. at p. __ [130 L.Ed.2d at p. 860-864, 115 S.Ct. at pp. 884-886.)

---

[9]While *Cooper* involved causes of action based on contract theories and age discrimination, we deal here with a common law claim of termination in violation of public policy, at least as to Mrs. Camp. (See fn. 8, *ante.*) Because we have already found that the Camps' at-will status barred their contract-based claims, we do not need to address whether after-acquired evidence could preclude those claims. (Cf. *Schuessler* v. *Benchmark Marketing and Consulting, Inc.* (1993) 243 Neb. 425, 441-442 [500 N.W.2d 529, 541] [after-acquired evidence may bar all recovery on wrongful discharge claim based on contract because "[b]reach of contract does not give rise to the same concerns or demand the same protections as does an action based on discrimination"]; *Earl* v. *Saks & Co.* (1951) 36 Cal.2d 602, 610-612 [226 P.2d 340] [contract induced by fraud is voidable].)

In that case, the employee (McKennon) had worked for the employer for 30 years and was 62 years old when she was discharged. The employer contended that McKennon was terminated as part of a reduction in force necessitated by financial considerations. After McKennon filed suit under the ADEA, the employer discovered that during the last year of her employment, she had removed and copied several confidential documents concerning the company's financial condition. McKennon claimed that she feared the loss of her job, so she copied the documents and took them home for "insurance" and "protection." The district court granted summary judgment to the employer, concluding that the after-acquired evidence of McKennon's misconduct justified her termination. The court of appeals affirmed.

The Supreme Court reversed, explaining: "The ADEA, enacted in 1967 as part of an ongoing congressional effort to eradicate discrimination in the workplace, reflects a societal condemnation of invidious bias in employment decisions. . . . [¶] Deterrence is one object of these [antidiscrimination] statutes. Compensation for injuries caused by the prohibited discrimination is another. . . . The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of the ADEA. . . . [¶] The objectives of the ADEA are furthered when even a single employee establishes that an employer has discriminated against him or her. The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important . . . ." (___ U.S. at p. ___ [130 L.Ed.2d at pp. 860-861, 115 S.Ct. at pp. 884-885], citations omitted.)[10]

In rejecting the employer's defense, the Supreme Court analyzed the after-acquired evidence of McKennon's wrongdoing under a theory of unclean hands. The court held that McKennon's inequitable conduct did not bar her lawsuit altogether. (___ U.S. at p. ___ [130 L.Ed.2d at pp. 861-862, 115 S.Ct. at p. 885].) It further concluded, however, that the available remedies were affected: "We have rejected the unclean hands defense 'where a private suit serves important public purposes.' That does not mean, however, the employee's own misconduct is irrelevant to all the remedies otherwise available under the statute. . . . The employee's wrongdoing must be taken into account, we conclude, lest the employer's legitimate concerns be ignored. The ADEA . . . is not a general regulation of the workplace but a law which prohibits discrimination. The statute does not constrain employers from exercising significant other prerogatives and discretions in the course of hiring, promoting, and discharging of their employees. In determining

---

[10]The court also overruled the line of cases on which Jeffer Mangels and the court below relied. (See ___ U.S. at p. ___ [130 L.Ed.2d at pp. 859-860, 115 S.Ct. at p. 883].)

appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, . . . but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (__ U.S. at p. __ [130 L.Ed.2d at pp. 862-863, 115 S.Ct. at p. 886], citations omitted.)[11]

California courts often look to decisions construing federal antidiscrimination statutes in deciding issues of state employment law. (See, e.g., *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 606-608 [262 Cal.Rptr. 842] [relying on federal case law to determine elements of sexual harassment claim under state antidiscrimination statute]; *Yurick* v. *Superior Court* (1989) 209 Cal.App.3d 1116, 1121-1123 [257 Cal.Rptr. 665] [following federal case law in determining if employee exhausted administrative remedies under state law].) However, we refer to federal decisions only "where appropriate." (*Page* v. *Superior Court* (1995) 31 Cal.App.4th 1206, 1215 [37 Cal.Rptr.2d 529] [declining to follow federal decisions in concluding that individual supervisor can be personally liable under state antidiscrimination statute].)

Here, Mrs. Camp's public policy claim[12] and Mr. Camp's marital status discrimination claim[13] allege conduct on the part of Jeffer Mangels that purportedly violated statutory law. In that regard, the claims are similar to

[11]The court stated that "as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy." (__ U.S.-at p. __ [130 L.Ed.2d at pp. 863, 115 S.Ct. at p. 886].) As to backpay, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." (*Ibid.*)

[12]To establish a wrongful termination in violation of public policy, an employee must prove that the employer's conduct violated a fundamental, substantial, and well-established policy of the state. (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 670, fn. 11.) The policy at issue must emanate from either a statutory or constitutional provision. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) We assume, without deciding, that Mrs. Camp's claim is based on a policy of sufficient public importance, i.e., the laws against insider trading. (See *Chadwick* v. *State Bar* (1989) 49 Cal.3d 103 [260 Cal.Rptr. 538, 776 P.2d 240] [attorney suspended from practice for insider trading]; *Sullivan* v. *Massachusetts Mut. Life Ins. Co.* (D.Conn. 1992) 802 F.Supp. 716, 723-724 [denying employer's summary judgment motion in part where employee claimed he was discharged for reporting what he reasonably believed to be insider trading].)

[13]The FEHA makes it unlawful to discriminate against an employee on the basis of "marital status." (Gov. Code, § 12940, subd. (a).) "Marital status discrimination may be established by showing that an . . . employee has been denied an employment benefit by reason of: [¶] . . . [¶] (c) The employment or *lack of employment* of an . . . employee's spouse." (Cal. Code Regs., tit. 2, § 7292.2, italics added.) If, as alleged, Mr. Camp was terminated solely because Mrs. Camp was terminated, then he was arguably "denied an employment benefit" by reason of his spouse's "lack of employment"—an issue we need not decide.

those in *Cooper* and *McKennon*. On the other hand, the nature of the Camps' misrepresentations and their potential detrimental impact on Jeffer Mangels distinguish this case from prior decisions.

In *Cooper*, the employee's misrepresentations disqualified him from employment based on the employer's internal, self-imposed requirements for the job (e.g., a refusal to hire applicants previously fired by another employer). The same is true for other after-acquired-evidence cases involving falsified job applications.[14] *McKennon*, albeit a case of on-the-job misconduct and not application fraud, also involved an employer's voluntarily adopted policy (i.e., one prohibiting the removal of confidential documents). While the job requirements and employer policies in all of those cases may have served legitimate business goals, the fact remains that they were self-imposed. Here, in contrast, the Camps misrepresented a job qualification imposed by the federal government, such that they were not *lawfully* qualified for the job.[15]

Jeffer Mangels's contract with the RTC required the firm to certify that none of its employees had ever been convicted of a felony. Federal law provides that "[t]he RTC shall not enter into a contract with any contractor unless the contractor and its related entities meet minimum standards of competence, integrity, fitness, and experience. In addition to presenting evidence . . . of competence and experience, the contractor . . . shall be required to certify to the following items: [¶] . . . [¶] (12) That the contractor will not employ any individual or subcontractor to perform work on the contract who: [¶] (i) Has been convicted of any felony." (12 C.F.R. § 1606.4(a)(12)(i) (1995).)

Further, "[w]henever a contractor receives information indicating that the certification or any information upon which it relied in preparing the certification is incorrect in any material respect, the contractor shall promptly notify the RTC." (12 C.F.R. § 1606.4(b)(3) (1995).) Finally, the RTC "may rescind any contract in its entirety or with respect to a particular assignment if: [¶] (1) There is a failure to disclose a material fact to the RTC; [¶] . . .

---

[14]See, e.g., *Washington v. Lake County, supra,* 969 F.2d at page 256 (county would have fired jailer had it known of his prior convictions); *Churchman v. Pinkerton's Inc.* (D.Kan. 1991) 756 F.Supp. 515, 521 (employer would not have hired plaintiff for security guard position had it known of her prior use of narcotics and discharge for cause); *Mathis v. Boeing Military Airplane Co., supra,* 719 F.Supp. 991 (employer would not have hired plaintiff had it known of her felony conviction and employment history).

[15]In *Mathis v. Boeing Military Airplane Co., supra,* 719 F. Supp. 991, the name of the employer, Boeing Military Airplane Company, suggests that it may have been subject to government-imposed qualifications on its employees. However, the decision does not refer to any such requirements, and we therefore consider *Mathis* distinguishable.

[¶] [or] (4) There is any material change in the representations or certifications provided to the RTC under § 1606.4 [concerning employees convicted of a felony]." (*Id.* § 1606.15(a).)

The Camps' misrepresentations about their felony convictions went to the heart of their employment relationship with Jeffer Mangels. Under its contract with the RTC, Jeffer Mangels was obligated to ensure that none of its employees had ever been convicted of a felony. In moving for summary judgment, Jeffer Mangels established that the Camps had in fact been convicted of a felony.[16] Further, the Camps' misrepresentations placed Jeffer Mangels in the risky position of certifying to the federal government—inaccurately—that all of the firm's employees met the RTC's qualifications. The Camps thus put Jeffer Mangels not only in jeopardy of losing its contract with the RTC but also of being accused of making false statements itself. Moreover, given the function of the RTC, the nature of the Camps' past criminal conduct—conspiring to defraud a federally insured bank—magnified the potential adverse consequences to Jeffer Mangels of certifying that none of its employees were convicted felons.[17]

As the Supreme Court recognized in *McKennon*, the use of after-acquired evidence must "take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (__ U.S. at p. __ [130 L.Ed.2d at

---

[16]The evidence also established without contradiction that the Camps would not have been hired had Jeffer Mangels known of their felony convictions. Similarly, had Jeffer Mangels learned of the convictions while the Camps were employed, it would have terminated them immediately. Thus, the misrepresentations were material. (See *McKennon v. Nashville Banner Pub. Co., supra*, __ U.S. at p. __ [130 L.Ed.2d at p. 864, 115 S.Ct. at pp. 886-887] ["Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."].)

[17]The Camps present two arguments in an effort to minimize the importance of the RTC certification requirements. We reject both. First, they contend that, to their knowledge, they did not work on any RTC matters. Even if true, that contention does not create a disputed issue of material fact regarding whether the RTC required Jeffer Mangels to certify that *none* of its employees had been convicted of a felony. Assuming arguendo that federal regulations (12 C.F.R. § 1606.4(a)(12)(i) (1995)) did not require such certification, Jeffer Mangels's contract with the RTC did. Second, the Camps claim that during a social event, they mentioned to Jeffer Mangels's director of human resources that they had had "problems with the law." The focus of this alleged conversation, however, was the nature of the "federal honor camp" where the Camps served time; they noted that the facility was co-ed, that they each had "an apartment with a key to [the] apartment," and that "we had tennis courts, golf courses, that we had dinner together every night, we had a theater, [and] we had McDonald's." This conversation, assuming it took place, did not inform the director of human resources that the Camps had been convicted of a felony. Nor does this evidence create a disputed issue of material fact regarding whether the Camps were qualified for their jobs under the RTC requirements.

p. 863, 115 S.Ct. at p. 886].) We appreciate that the facts in *McKennon* (and the cases it overruled) presented a situation where balancing the equities should permit a finding of employer liability—to reinforce the importance of antidiscrimination laws—while limiting an employee's damages—to take account of an employer's business prerogatives.

However, the equities compel a different result where an employee who is disqualified from employment by government-imposed requirements nevertheless obtains a job by misrepresenting the pertinent qualifications. In such a situation, the employee should have no recourse for an alleged wrongful termination of employment.[18] As stated by another court, "The present case is akin to the hypothetical wherein a company doctor is fired [for improper reasons] and the company, in defending a civil rights action, thereafter discovers that the discharged employee was not a 'doctor.' In our view, the masquerading doctor would be entitled to no relief . . . ." (*Summers* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 864 F.2d at p. 708.)

Like the court in *McKennon*, we look to the doctrine of unclean hands for guidance. ■ That doctrine rests on the maxim that "he who comes into equity must come with clean hands." (*Ellenburg* v. *Brockway, Inc.* (9th Cir. 1985) 763 F.2d 1091, 1097.) " 'This maxim is far more than a mere banality. It . . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.' " (*Burton* v. *Sosinsky* (1988) 203 Cal.App.3d 562, 573 [250 Cal.Rptr. 33].) In California, the doctrine of unclean hands may apply to legal as well as equitable claims (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728-729 [39 Cal.Rptr. 64]) and to both tort and contract remedies (*Burton* v. *Sosinsky, supra*, 203 Cal.App.3d at p. 573; *Blain* v. *Doctor's Co.* (1990) 222 Cal.App.3d 1048 [272 Cal.Rptr. 250]).[19]

Of course, ". . . it is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which

---

[18]Assuming Mr. Camp was hired before Jeffer Mangels became a contractor with the RTC, that circumstance would not alter the result. The evidence established that his felony conviction precluded him from being hired even if the RTC requirements were not then in effect. Moreover, Mr. Camp was employed by Jeffer Mangels when the RTC requirements became applicable (sometime in 1990), such that the government criteria rendered him unqualified for continued employment as of that time.

[19]The Camps' causes of action are best described as legal claims seeking tort relief. (See Ballentine's Law Dict. (3d ed. 1969) p. 19, col. 2 [defining "action at law" as "[a]n action, the purpose of which is the recovery of a sum of money or damages"]; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 175-176 [164 Cal.Rptr. 839, 610 P.2d 1330] [claim of wrongful termination in violation of public policy subjects employer to tort liability]; *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 221 [185 Cal.Rptr. 270, 649 P.2d 912] [tort relief available in action under FEHA].)

brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court." (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* 227 Cal.App.2d at pp. 728-729.)

In this case, we are satisfied that the Camps' misrepresentations about their felony convictions relate directly to their wrongful termination claims. Since the Camps were not lawfully qualified for their jobs, they cannot be heard to complain that they improperly lost them. Given the nature of the misrepresentations, their potential damage to Jeffer Mangels, and the fact that the Camps were disqualified from employment by means of government requirements, the public policies of the state are adequately served by barring the Camps' claims and allowing them, if they so desire, to report Jeffer Mangels's alleged wrongdoing to the appropriate authorities. (See *Blain* v. *Doctor's Co., supra,* 222 Cal.App.3d at pp. 1063-1064 [plaintiff's legal malpractice claim barred by his own unclean hands; attorney's alleged misconduct—suborning perjury—can be adequately rectified in professional disciplinary hearings or through criminal prosecution].)[20]

Accordingly, the trial court properly found for Jeffer Mangels on the third cause of action.

### 4. Fourth Cause of Action (Misrepresentation)

In the last cause of action, Mrs. Camp alleges that Jeffer Mangels falsely told her it would find her another position within the firm (other than working for Mr. Goldie). She contends the firm had no intention of placing her elsewhere. She further alleges that Jeffer Mangels falsely stated at one point that no other positions were available. Mrs. Camp purportedly relied on these statements to her detriment by not seeking employment with a different employer.[21]

To prevail on a claim for misrepresentation, Mrs. Camp must establish that she justifiably relied on the alleged statements. (See *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623, 635 [178 Cal.Rptr. 167].) Of course, Mrs. Camp was an at-will employee who thus had no reasonable expectation that she

---

[20]By precluding the Camps from any recovery and allowing the proper authorities to remedy Jeffer Mangels's alleged wrongdoing, we promote both public policies at issue in this case: (1) the employees' interest in preventing wrongful terminations and (2) the employer's need to comply with government-mandated employment criteria. (Cf. *De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 868 [250 P.2d 598] [doctrine of unclean hands not applicable if it would harm the public interest].)

[21]It is difficult to understand how the second alleged misrepresentation—that no positions were available—would cause Mrs. Camp to forgo a job search. Indeed, the complaint alleges that Jeffer Mangels made that misrepresentation to induce her to leave the firm.

would be employed by Jeffer Mangels for any particular length of time. In essence, her misrepresentation claim asserts nothing more than that she interpreted the alleged misrepresentations as a promise of continued employment. However, a promise to find an employee another position does not create a justifiable expectation that the employee will be continuously employed. Such a promise still allows for the possibility—consistent with at-will status—that the employee will be discharged with or without cause after the promise is made. (See fn. 7, *ante.*) Because the alleged misrepresentations did not create a reasonable expectation of employment for any specific period, Mrs. Camp could not justifiably rely on those statements in deciding to forgo seeking employment with another employer. (See *Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at p. 482 [employee cannot reasonably rely on promise in conflict with at-will provision].)

The trial court properly adjudicated the fourth cause of action in Jeffer Mangels's favor.

B. *Motion to Return Jeffer Mangels's Documents*

■ The Camps also seek reversal of the trial court's order that they return to Jeffer Mangels documents that Mrs. Camp removed from its office shortly after her termination. The trial court found the documents to be protected by the attorney-client privilege and ordered them to be returned. We review the order for an abuse of discretion. Finding none, we affirm.

The evidence before the trial court on Jeffer Mangels's "motion for return of confidential client documents" indicated that, after her discharge, Mrs. Camp returned to the firm to pick up her personal belongings. When she left the office on that occasion, she took with her certain documents she had been maintaining in a personal file. Most, if not all, of the documents at issue consisted of correspondence or memoranda between Mr. Goldie and the firm's clients or other attorneys. Although the assistant director of human resources, Lisa Gepner, was present when Mrs. Camp removed the file with the documents, the record does not indicate that Gepner knew what was in the file.

While the burden of proof was on Jeffer Mangels to establish that the documents in question were protected by the attorney-client privilege (*National Steel Products Co.* v. *Superior Court* (1985) 164 Cal.App.3d 476, 483 [210 Cal.Rptr. 535]), the burden was on the Camps to establish an exception to the privilege, e.g., the crime/fraud exception (*Geilim* v. *Superior Court* (1991) 234 Cal.App.3d 166, 174 [285 Cal.Rptr. 602]). Based on the evidence, the trial court properly concluded that the documents were protected by the attorney-client privilege. Further, because the Camps did not establish

that the documents reflected illegal conduct (i.e., Goldie's alleged insider trading), the crime/fraud exception to the privilege did not apply. Accordingly, the court did not abuse its discretion in ruling that the Camps had to return all the documents (including copies) to Jeffer Mangels.

## DISPOSITION

The judgment and the order are affirmed.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied June 29, 1995, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 17, 1995.