Filed 6/26/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| VICENTE SALAS, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S196568 |
| v. | ) | |
| | ) | Ct.App. 3 C064627 |
| SIERRA CHEMICAL CO., | ) | |
| | ) | San Joaquin County |
| Defendant and Respondent. | ) | Super. Ct. No. CV033425 |
| _____ | ) | |

Plaintiff sued his former employer under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), alleging that defendant employer failed to reasonably accommodate his physical disability and refused to rehire him in retaliation for plaintiff's having filed a workers' compensation claim. Thereafter, defendant learned of information suggesting that plaintiff, to gain employment with defendant, had used another man's Social Security number.

The trial court denied defendant employer's motion for summary judgment. When defendant sought a writ of mandate in the Court of Appeal, that court issued an alternative writ. In response, the trial court vacated its order denying defendant's motion for summary judgment, and it entered an order granting the motion. Plaintiff employee appealed from the ensuing judgment, which the Court of Appeal affirmed. It held that plaintiff's action was barred by the doctrines of after-acquired evidence and unclean hands (based on information defendant acquired during discovery showing wrongdoing by plaintiff), and that here

application of those doctrines was not precluded by Senate Bill No. 1818 (2001-2002 Reg. Sess.) (Senate Bill No. 1818), enacted in 2002 (Stats. 2002, ch. 1071, pp. 6913-6915).  That state law declares:  "All protections, rights and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals *regardless of immigration status* who have applied for employment, or who are or who have been employed, in this state." (Stats. 2002, ch. 1071, § 1, p. 6913, italics added.)

After we granted plaintiff employee's petition for review, we asked both parties for supplemental briefing on whether federal immigration law preempts California's Senate Bill No. 1818, an issue the parties had not raised before.  We conclude:  (1) Senate Bill No. 1818, which extends state law employee protections and remedies to all workers "regardless of immigration status," is not preempted by federal immigration law except to the extent it authorizes an award of lost pay damages for any period after the employer's discovery of an employee's ineligibility to work in the United States; and (2) contrary to the Court of Appeal's holdings, the doctrines of after-acquired evidence and unclean hands are not complete defenses to a worker's claims under California's FEHA, although they do affect the availability of remedies.  Accordingly, we reverse and remand the matter for further proceedings.

## I

Because this case arises from an order granting summary judgment to a defendant, we briefly set forth the governing principles.  A trial court should grant a defendant's motion for summary judgment if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law.  On appeal, we review the matter independently, resolving in the plaintiff's favor any doubts regarding the propriety of summary judgment.  (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606.)

2

Defendant Sierra Chemical Co. manufactures, packages, and distributes chemicals for treating water, including water in swimming pools. As the weather gets warmer in spring and summer, consumer demand for defendant's products increases, while in fall and winter demand decreases, which in turn results in defendant's seasonal layoffs of many production line employees. Those laid-off workers generally are recalled to work when consumer demand rises.

In April 2003, plaintiff Vicente Salas applied for a job with defendant, providing a Social Security number and a resident alien card. He completed and signed, under penalty of perjury, federal Immigration and Naturalization form I-9, in which he listed the same Social Security number he had given to defendant, and he attached to the form a copy of a Social Security card with that number. He also signed an employee's Internal Revenue Service withholding form W-4, which had the same Social Security number he had given defendant. In May 2003, plaintiff began working on defendant's production line.

In October 2003, plaintiff was laid off because of defendant's seasonal reduction of production line workers. In March 2004, when plaintiff was called back to work, he used the same Social Security number as before, and the same number again appeared on federal I-9 and W-4 forms he completed. In December 2004, plaintiff was again laid off. When he was recalled to work in March 2005, the federal W-4 form he signed had the same Social Security number he had provided earlier. Plaintiff was not laid off during the fall and winter of 2005.

In late 2004 or early 2005, plaintiff received a letter from the federal Social Security Administration stating that his name and Social Security number did not match the agency's records. Some of his coworkers received similar letters. Plaintiff asserts that a few days later defendant's production manager, Leo Huizar, told the workers not to worry about discrepancies with Social Security numbers

because as long as the company's president was satisfied with their work they would not be terminated.

In March 2006, plaintiff injured his back while stacking crates on defendant's production line, and he was taken to a hospital. The next day, plaintiff returned to work under a physician's restrictions that he was not to lift anything weighing more than 10 to 15 pounds; he was not to sit, stand, or walk for prolonged periods; and he was to limit bending, twisting, and stooping at the waist. Defendant employer modified plaintiff's work duties accordingly. On June 9, after giving defendant a doctor's release, plaintiff resumed full duties.

On August 16, 2006, plaintiff again injured his back while stacking crates and was taken to the hospital. That same day he returned to work, finishing his shift under the same work restrictions as before. Thereafter, plaintiff filed a workers' compensation claim for his workplace back injury. Plaintiff still came to work, performing modified duties, until December 15, 2006, when he was laid off during defendant's seasonal reduction of workers.

In either late January or early February of 2007, plaintiff started working for another company. According to plaintiff's declaration filed in opposition to defendant employer's motion for summary judgment, Leo Huizar, defendant's production manager, telephoned him in March 2007. Huizar asked plaintiff if he wanted to return to work and if he had fully recovered from his back injuries. When plaintiff said he was still seeing a doctor, Huizar responded that plaintiff could "not return to work like that," adding it would violate defendant employer's policies to do so.

On May 1, defendant sent plaintiff a letter stating that it was recalling laid-off employees and informing him to call or come to defendant's office to make arrangements to return to work. The letter also told him to bring "a copy of your doctor's release stating that you have been released to return to full duty."

4

According to Huizar's declaration in support of defendant's motion for summary judgment, plaintiff contacted Huizar on May 6, 2007, and said that he had not reported for work as he had not yet been released by his physician but that he had an appointment on June 12 to obtain the release. Huizar then agreed to hold the job open for plaintiff until plaintiff obtained the doctor's release, and Huizar told plaintiff to call him if plaintiff was unable to get the release. Huizar never heard from plaintiff again.

In August 2007, plaintiff sued defendant. Plaintiff alleged two causes of action. The first cause of action alleged that plaintiff was disabled and that defendant failed to provide reasonable accommodations for his disability, in violation of California's FEHA. The second cause of action alleged that defendant wrongfully denied plaintiff employment, in violation of the public policy expressed in the FEHA, by retaliating against him for filing a workers' compensation claim against defendant and for being disabled. Both causes of action sought to recover lost wages, compensatory damages for emotional distress, punitive damages, and attorney fees.

After trial was set for April 9, 2009, both parties filed motions in limine. In one of his motions, plaintiff employee acknowledged that it is a criminal offense under federal law (18 U.S.C. § 1546(b)(2)) and a felony under state law (Pen. Code, § 114) for a person to use false identification documents to conceal the person's true citizenship or resident alien status. Plaintiff stated that he would testify at trial and assert his privilege against self-incrimination under the Fifth Amendment to the United States Constitution if asked about his immigration status. He asked that he be allowed to assert the privilege outside the jury's presence and that the court and counsel not comment at trial on his assertion of the privilege. This information led defendant employer to investigate the authenticity

5

of the documents plaintiff had given to defendant in connection with plaintiff's employment by defendant.

On July 24, 2009, defendant filed a motion for summary judgment, which is at issue here. Defendant sought a determination by the trial court that defendant was entitled to a judgment as a matter of law under the legal doctrines of after-acquired evidence and unclean hands, based on plaintiff's fraudulent use of another person's Social Security number and card to obtain employment with defendant. In support, defendant submitted a declaration from Kelly R. Tenney saying that he is a resident of North Carolina and has a certain Social Security number, which is the one plaintiff used when he applied for a job with defendant. Tenney said in his declaration that he did not know plaintiff and had given no one permission to use his Social Security number. Defendant also provided a declaration from its president, Stanley Kinder, stating that defendant has a long-standing policy of not hiring anyone who is prohibited by federal law from working in the United States, and that defendant would immediately discharge any employee upon defendant's discovery that the employee had given defendant false information or documents to establish work eligibility in the United States.

When the trial court denied defendant employer's motion for summary judgment, defendant sought a writ of mandate from the Court of Appeal. When that court issued an alternative writ, the trial court vacated its earlier order denying defendant's motion and entered a new order granting the motion. Plaintiff appealed from the ensuing judgment, which the Court of Appeal affirmed. The Court of Appeal concluded that plaintiff's claims were barred by both the doctrine of after-acquired evidence and the doctrine of unclean hands.

The Court of Appeal reasoned that the doctrine of after-acquired evidence barred plaintiff's causes of action because he had misrepresented to defendant employer his eligibility under federal law to work in the United States. It also held

6

that plaintiff's claims were subject to the doctrine of unclean hands because he had falsely used another person's Social Security number in seeking employment with defendant, he was disqualified under federal law from working in the United States, and his conduct exposed defendant to penalties under federal law.

**II**

The threshold inquiry here is whether the federal Immigration Reform and Control Act of 1986 (8 U.S.C. § 1101 et seq.), also known as IRCA, preempts application of the antidiscrimination provisions of California's FEHA to workers who are unauthorized aliens.[1] For the reasons given below, we conclude that the FEHA is generally not preempted by federal immigration law, but that federal preemption does bar an award of lost pay damages under the FEHA for any period of time *after* an employer's discovery of the employee's ineligibility under federal law to work in the United States.

Federal immigration law requires employers to verify the identity and work eligibility of new employees (8 U.S.C. § 1324a(a)(1)(B)(i)); upon an employer's discovery of a worker's unauthorized immigration status, termination is required (*id*., § 1324a(a)(2)). An *employer* who violates these federal law provisions is subject to civil fines (*id.*, § 1324a(e)(4)(A)) and to criminal prosecution (*id.*, § 1324a(f)(1)). A *worker* who uses false documents to gain employment is likewise subject to civil fines and criminal prosecution. (*Id.*, § 1324c(a)(1)-(3); 18 U.S.C. § 1546(b).)

---

[1] Because the issue involves federal immigration law, we here use that law's terminology. The Immigration Reform and Control Act of 1986 defines "alien" as "any person not a citizen or national of the United States" (8 U.S.C. § 1101(a)(3)) and states that "the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either [¶] (A) an alien lawfully admitted for permanent residence, or [¶] (B) authorized to be so employed by this chapter or by the Attorney General" (*id.*, § 1324a(h)(3)).

7

The California law at issue here is not only the FEHA, but also Senate Bill No. 1818, which added to California's statutory scheme four nearly identical provisions:  Civil Code section 3339, Government Code section 7285, Health and Safety Code section 24000, and Labor Code section 1171.5.**2**  Particularly pertinent here is Government Code section 7285, which states:

"The Legislature finds and declares the following:

"(a)  All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals *regardless of immigration status* who have applied for employment, or who are or who have been employed, in this state.

"(b)  For purposes of enforcing state labor, employment, civil rights, and employee housing laws, a person's immigration status is irrelevant to the issue of liability, and in proceedings or discovery undertaken to enforce those state laws no inquiry shall be permitted into a person's immigration status except where the person seeking to make this inquiry has shown by clear and convincing evidence that the inquiry is necessary in order to comply with federal immigration law.

"(c)  The provisions of this section are declaratory of existing law.

"(d)  The provisions of this section are severable.  If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application."  (Italics added.)

---

**2**      The language of Civil Code section 3339 and Government Code section 7285 is the same.  The language of the other two provisions — Health and Safety Code section 24000 and Labor Code section 1171.5 — differs only in the wording of subdivision (b).  While Civil Code section 3339 and Government Code section 7285 refer to "state labor, employment, civil rights, and employee housing laws," Health and Safety Code section 24000 and Labor Code section 1171.5 both refer only to "state labor and employment laws."

The California Legislature enacted Senate Bill No. 1818 in 2002 in response to the United States Supreme Court's decision earlier the same year in *Hoffman Plastic Compounds, Inc. v. NLRB* (2002) 535 U.S. 137 (*Hoffman*). (See *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1197, fn. 3.) In *Hoffman*, the National Labor Relations Board (NLRB) had determined that an employer violated the National Labor Relations Act (NLRA) by selecting four employees for layoffs because they had supported a union's organizing activities. One of those employees, Jose Castro, testified at the administrative hearing that he was illegally in the United States and had used a friend's birth certificate to obtain a California driver's license and a federal Social Security card, enabling Castro to obtain employment before and after the layoff. (*Hoffman*, at p. 141.) The NLRB awarded Castro backpay plus interest from the date he was laid off until the date the employer first learned of Castro's undocumented status, a period of four and one-half years. (*Id.* at pp. 141-142.) The federal court of appeals upheld the NLRB's award. The United States Supreme Court reversed. It said that the NLRB could not "award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud." (*Id.* at p. 149.) "[A]warding backpay to illegal aliens," the high court held, "runs counter to policies underlying" the Immigration Reform and Control Act of 1986. (*Ibid.*)

Under the United States Constitution's supremacy clause (U.S. Const., art. VI, cl. 2), federal law can preempt or supersede state law. California law, as established by Senate Bill No. 1818, makes all state-provided worker protections, rights, and remedies (except reinstatement prohibited by federal law) "available to all individuals regardless of immigration status." (Gov. Code, § 7285, subd. (a).) Are those worker protection state law provisions preempted by the federal Immigration Reform and Control Act of 1986, which the high court held in

9

*Hoffman*, *supra*, 535 U.S. 137, prohibited the NLRB from awarding backpay to an unauthorized alien who used false documents to get a job? The answer cannot be found in *Hoffman*, which did not decide any issue regarding federal preemption of state law but instead addressed federal immigration law's impact on a *federal agency's* authority to award a remedy for a violation of *federal law.* At issue here, by contrast, is whether federal immigration law preempts a *state* antidiscrimination law enforced through a *private action* for damages.

Furthermore, California's FEHA, at issue here, differs significantly from the NLRA, at issue in *Hoffman*. In enacting the FEHA, California's Legislature sought to safeguard the rights of all persons to seek, obtain, and hold employment without discrimination on account of various characteristics, including race, national origin, physical disability, and medical condition. (Gov. Code, § 12920; see *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984; *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 891.) To combat invidious employment discrimination, the FEHA's remedial scheme depends heavily on private causes of action in which compensatory damages, including lost pay, may be awarded. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 112 ["[U]nder the FEHA, private civil actions by employees are the primary means of enforcing employees' rights to be free of unlawful discrimination, once the Department of Fair Employment and Housing determines it will not file a complaint against the employer."]; *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 218, fn. 8 [noting that the Department of Fair Employment and Housing routinely issues right-to-sue letters to FEHA claimants].)

The federal NLRA, to achieve its goals, does not similarly rely on private causes of action or the remedy of lost pay damages. Rather, the NLRB can adequately enforce the NLRA's policies by issuing remedial orders enforceable

10

through its contempt power. (See *Hoffman*, *supra*, 535 U.S. at p. 152 [stating that "such 'traditional remedies' " are "sufficient to effectuate national labor policy regardless of whether the 'spur and catalyst' of backpay accompanies them"].) Because of this critical difference between California's FEHA and the federal NLRA, relating to the role played by lost pay awards in achieving California's remedial legislative goal, we do not consider the high court's decision in *Hoffman* controlling here. (See *Rivera v. Nibco, Inc.* (9th Cir. 2004) 364 F.3d 1057, 1066-1067 [expressing doubt that *Hoffman* applies to federal title VII cases because title VII, like the FEHA, relies on private actions for enforcement]; *Majlinger v. Cassino Contracting Corp.* (2005) 802 N.Y.S.2d 56, 66 ["the holding of *Hoffman* is not so broad as to require a ruling that a New York court's award of lost wages to an undocumented alien is preempted by [federal immigration law] or the policy underlying it"].)

In addressing the issue of federal preemption, we note, preliminarily, that the federal Immigration Reform and Control Act of 1986 does not preempt all state laws relating to unauthorized aliens. In the words of the high court: "Power to regulate immigration is unquestionably exclusively a federal power. [Citations.] But the [United States Supreme] Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power, whether latent or exercised." (*De Canas v. Bica* (1976) 424 U.S. 351, 354-355 (*De Canas*).) The high court reaffirmed that observation recently in *Arizona v. United States* (2012) ___ U.S. ___ [132 S.Ct. 2492, 2503-2504].

The high court in *Arizona v. United States* reiterated the three established types of federal law preemption. Federal law preempts a state law when: (1) Congress, acting within its authority, enacts an express provision requiring preemption; (2) the federal regulation's reach is so pervasive as to leave no room

for state regulation, or the federal interest is so dominant that it will be assumed that federal law displaces any state law on the same subject; or (3) the state law conflicts with federal law, either because compliance with both laws is impossible or because the state law is an obstacle to accomplishing congressional objectives. (*Arizona v. United States*, *supra*, __ U.S. at p. __ [132 S.Ct. at pp. 2500-2501]; *English v. General Electric Co.* (1990) 496 U.S. 72, 78-79; see *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.)  Because "[f]ederalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect" (*Arizona v. United States*, *supra*, at p. __ [132 S.Ct. at p. 2500]), the presumption is *against* federal preemption of state law.  In preemption analysis, therefore, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' "  (*Id.* at p. __ [132 S.Ct. at p. 2501].)

We now apply these principles to the question here of whether federal immigration law (specifically, the federal Immigration Reform and Control Act of 1986) preempts California's Senate Bill No. 1818, which was enacted in 2002.

Turning to the *first* type of preemption — express preemption — we note that the federal Immigration Reform and Control Act of 1986 has an express preemption provision, which states:  "The provisions of this section preempt any State or local law *imposing civil or criminal sanctions* (other than through licensing and similar laws) *upon those who employ . . . unauthorized aliens*."  (8 U.S.C. § 1324a(h)(2), italics added.)  We agree with plaintiff employee that this provision is inapplicable here.  Rather than asserting any claim of employer wrongdoing in hiring unauthorized aliens, plaintiff seeks in this lawsuit to impose civil sanctions upon defendant employer for alleged violations of California's FEHA, which prohibits invidious employment discrimination.  Accordingly, the

12

relevant federal immigration law does not *expressly* preempt California's provisions, enacted by Senate Bill No. 1818, granting state employment law protections to all workers "regardless of immigration status."

We now consider the *second* type of preemption — field preemption — which occurs *either* when the *federal regulation is so pervasive* as to leave no room for state regulation, or when the *federal interest is* " 'so dominant* that the federal system will be assumed to preclude enforcement of state laws on the same subject' " (*Arizona v. United States*, *supra*, __ U.S. at p. __ [132 S.Ct. at p. 2501], italics added). Some years before its *Arizona* decision, the United States Supreme Court addressed the dominant federal interest aspect of field preemption in *De Canas*, *supra*, 424 U.S. 351. At issue there was the constitutionality of a former California law (Lab. Code, former § 2805, enacted by Stats. 1971, ch. 1442, § 1, p. 2847, repealed by Stats. 1988, ch. 946, § 1, p. 3025) that prohibited employers from knowingly employing nonresident aliens if their employment adversely affected lawful resident workers. *De Canas* held that the federal interest in regulating employment of unauthorized aliens was not so dominant as to preclude state laws on the same subject (*De Canas*, at pp. 359-361), although the high court ultimately did not resolve the preemption issue, concluding that issues regarding the proper construction of the challenged state law needed to be resolved first by state courts (*id*. at pp. 364-365). Plaintiff employee here relies on this statement by the high court in *De Canas*: "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples." (*Id.* at p. 356.) Because *De Canas* dealt only with the dominant federal interest aspect of field preemption, it did not address the federal regulation pervasiveness aspect, which is at issue here and which we explore below.

13

At the time of *De Canas*, federal immigration law expressed at best "a peripheral concern with employment of illegal entrants." (*De Canas*, *supra*, 424 U.S. at p. 360, fn. omitted.) That changed 10 years after the high court's 1976 *De Canas* decision, when Congress enacted the Immigration Reform and Control Act of 1986. That law, with its focus on employment of unauthorized aliens, " 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.' " (*Hoffman*, *supra*, 535 U.S. at p. 147, quoting *INS v. National Center for Immigrants' Rights, Inc.* (1991) 502 U.S. 183, 194 & fn. 8.) The question before us: Has federal immigration regulation now become so pervasive as to leave no room for state employment laws that extend antidiscrimination protections with lost pay remedies to employees who are unauthorized aliens?

The high court has recently pointed out, as noted earlier, that the states' historic police powers are *not* preempted "unless that was the 'clear and manifest purpose of Congress' " (*Arizona v. United States*, *supra*, __ U.S. at p. __ [132 S.Ct. at p. 2501]), and it has acknowledged that regulation of the employment relationship is within the states' police powers (*De Canas*, *supra*, 424 U.S. at p. 356). The parties here have not cited, nor has our research disclosed, evidence of a clear and manifest purpose by Congress to occupy the field of immigration regulation so completely as to preclude the states from applying to unauthorized aliens the states' own worker protection labor and employment laws. A conclusion that Congress has occupied the field would dramatically affect state laws such as those regulating workers' compensation, minimum wages, working hour limits, and worker safety. We therefore conclude that the federal regulation imposed by the Immigration Reform and Control Act of 1986 is not so pervasive as to leave no room for any state law on the same subject.

14

We now address the *third* type of federal preemption — conflict preemption — which occurs when state law conflicts with federal law either because compliance with both laws is impossible or because state law is an obstacle to achieving the federal law's objectives. (*Arizona v. United States*, *supra*, __ U.S. at p. __ [132 S.Ct. at p. 2501].) We first consider whether compliance with both federal and state laws is impossible. This inquiry requires us to distinguish here between (1) the period dating from the occurrence of the employer's alleged wrongful act until the employer's discovery of the employee's ineligibility under federal immigration law to work in the United States (the prediscovery period) and (2) the period *after* the employer's discovery of that ineligibility (the post-discovery period). This distinction is called for because the federal Immigration Reform and Control Act of 1986 prohibits an employer from continuing to employ an unauthorized alien upon discovery of the worker's unauthorized status. (8 U.S.C. § 1324a(a)(2); *Hoffman*, *supra*, 535 U.S. at p. 148.)

We first consider the post-discovery period. Because under federal immigration law an employer may not continue to employ a worker known to be ineligible (8 U.S.C. § 1324a(a)(2)), any state law award that compensates an unauthorized alien worker for loss of employment during the post-discovery period directly conflicts with the federal immigration law prohibition against continuing to employ workers whom the employer knows are unauthorized aliens. Such an award would impose liability on the employer for not performing an act (continuing to employ a worker known to be an unauthorized alien) expressly prohibited by federal law.[3] Thus, federal law preempts state Senate Bill No. 1818

---

[3]     Our preemption analysis for the post-discovery period is limited to employers who discover the plaintiff employee's unauthorized status *after* the employee has been discharged or not rehired. Not addressed here is a situation in

*(Footnote continued on next page.)*

to the extent that it makes a California FEHA lost pay award available to an unauthorized alien worker for the post-discovery period.**4**

We now turn to the prediscovery period. In allowing lost wages for that period, our state labor laws do not directly conflict with the federal Immigration Reform and Control Act of 1986, because compliance with both federal and state laws is not impossible, as we now explain. Although federal immigration law prohibits an unauthorized alien's use of any false document to get a job (8 U.S.C. § 1324c(a)(1)-(3)), that law does not prohibit an employer from paying, or an employee from receiving, wages earned during employment wrongfully obtained by false documents, so long as the employer remains unaware of the employee's unauthorized status. Thus, allowing recovery of lost wages for the prediscovery period does not produce an "inevitable collision between the two schemes of regulation." (*Florida Avocado Growers. v. Paul* (1963) 373 U.S. 132, 143.)

---

*(Footnote continued from previous page.)*

which an employer has *knowingly* hired or continued to employ an unauthorized alien in violation of federal immigration law (see 8 U.S.C. § 1324a(a)(1)-(2)). Because imposing full liability for lost wages would provide a disincentive for such immigration law violations, thereby furthering the goals of federal immigration law, in these situations arguably federal law would not preempt lost wages remedies for violations of state laws like California's FEHA.

**4**      California's Senate Bill No. 1818 makes available "[a]ll protections, rights, and remedies available under state law" relating to employment (except for any reinstatement remedy prohibited by federal law) "regardless of immigration status." Such state law remedies cover a wide range. For example, in an action alleging violation of California's FEHA a worker may recover any "damages 'generally available in noncontractual actions' " (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1042), including wages a wrongfully terminated worker would have earned absent the termination (see *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 873, fn. 17).

We now consider conflict preemption's remaining aspect— also known as obstacle preemption — which exists when the state regulation would frustrate the federal law's purpose.  Whether there is obstacle preemption is determined by "examining the federal statute as a whole and identifying its purpose and intended effects."  (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 373.)  If the federal law's purpose cannot otherwise be achieved, " 'the state law must yield to the regulation of Congress within the sphere of its delegated power.' " (*Ibid.*)

The Immigration Reform and Control Act of 1986, at issue here, is "a comprehensive scheme prohibiting the employment of [unauthorized] aliens in the United States."  (*Hoffman*, *supra*, 535 U.S. at p. 147.)  To achieve the goal of eliminating employment of unauthorized aliens, federal law requires employers to verify that prospective employees are eligible to work in the United States (8 U.S.C. § 1324a(b)), prohibits employers from hiring those unable to provide documents establishing employment eligibility (*id.*, § 1324a(a)(1)), and compels employers to immediately discharge any unauthorized alien worker upon discovery of the worker's unauthorized status (*id.*, § 1324a(a)(2)).  Employers violating these federal law provisions are subject to an escalating series of civil penalties (*id.*, § 1324a(e)(4)(A)), as well as potential criminal prosecution (*id.*, § 1324a(f)(1)).

Far less stringent, however, is federal immigration law's approach to unauthorized alien workers.  Although Congress made it a crime for an unauthorized alien to use false documents to obtain employment (18 U.S.C. § 1546(b)), Congress did not impose criminal sanctions on unauthorized aliens merely for seeking or engaging in unauthorized work.  As the high court recently pointed out, "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment," as this "would be

17

inconsistent with federal policy and objectives." (*Arizona v. United States*, *supra*, __ U.S. at p. __ [132 S.Ct. at p. 2504].)

California's Senate Bill No. 1818 expressly makes the worker protection provisions of state employment and labor laws available to all workers "regardless of immigration status." The protections thus extend even to those unauthorized aliens who, in violation of federal immigration law, have used false documents to secure employment. Even if permitting those workers to obtain state remedies for violations of the state labor and employment laws provides an incentive for such federal law violations, the practical effect of such incentive is minimal because the typical unauthorized alien wage earner is not familiar with the state law remedies available for unlawful termination and because job seekers rarely contemplate being terminated in violation of the law. Thus, it is highly unlikely that an unauthorized alien's decision to seek employment in this country would be based in any significant part on the availability of lost wages as a remedy for unlawful discharge. Any unauthorized aliens who did consider this remedy would also realize that by pursuing state law remedies after termination they would risk discovery of their unauthorized status, thereby exposing them to criminal prosecution under both federal law (18 U.S.C. § 1546(b)) and state law (Pen. Code, § 114) and to deportation. (See *Grocers Supply, Inc. v. Cabello* (Tex. Ct.App. 2012) 390 S.W.3d 707, 719 [stating that "potential damage awards are not meaningful incentives to draw illegal immigrants into this country"].)

Furthermore, *not* allowing unauthorized workers to obtain state remedies for unlawful discharge, including prediscovery period lost wages, would effectively immunize *employers* that, in violation of fundamental state policy, discriminate against their workers on grounds such as disability or race, retaliate against workers who seek compensation for disabling workplace injuries, or fail to pay the wages that state law requires. The resulting lower employment costs would

18

encourage employers to hire workers known or suspected to be unauthorized aliens, contrary to the federal law's purpose of eliminating employers' economic incentives to hire such workers by subjecting employers to civil as well as criminal penalties.  (See *Sure-Tan, Inc. v. NLRB* (1984) 467 U.S. 883, 893-894 [recognizing that enforcing labor laws on behalf of undocumented aliens reduces an employer's incentive to unlawfully hire them]; *Reyes v. Van Elk, Ltd.* (2007) 148 Cal.App.4th 604, 617 ["Allowing employers to hire undocumented workers and pay them less than the wage mandated by statute is a strong incentive for the employers to do so, which in turn encourages illegal immigration."]; *Farmer Brothers Coffee v. Workers' Comp. Appeals Bd*. (2005) 133 Cal.App.4th 533, 540 [if unauthorized aliens were to be denied state labor law protections, "unscrupulous employers would be encouraged to hire aliens unauthorized to work in the United States, by taking the chance that the federal authorities would accept their claims of good faith reliance upon immigration and work authorization documents that appear to be genuine"].)  It would frustrate rather than advance the policies underlying federal immigration law to leave unauthorized alien workers so bereft of state labor law protections that employers have a strong incentive to "look the other way" and exploit a black market for illegal labor.  Accordingly, after comparing the likely effects of applying and not applying state labor and employment law protection to unauthorized alien workers, we conclude that Senate Bill No. 1818, insofar as it makes available to such workers the remedy of *prediscovery period* lost wages for unlawful termination in violation of the FEHA, does not frustrate the purpose of the federal Immigration Reform and Control Act of 1986, and thus is not preempted.

### III

Plaintiff employee challenges the Court of Appeal's holdings that the doctrines of after-acquired evidence and unclean hands are complete defenses to

19

plaintiff's action against defendant employer.  Before addressing plaintiff's challenges, we consider whether the Legislature, when it enacted Senate Bill No. 1818, adopted the reasoning of two Court of Appeal decisions addressing the application of those doctrines in employment termination cases.

### A.  Senate Bill No. 1818 and Then Existing Law

The California Legislature enacted Senate Bill No. 1818 in 2002.  As we have noted (see *ante*, at p. 9), that law was a direct response to the high court's 2002 decision in *Hoffman*, *supra*, 535 U.S. 137, to ensure that in California unauthorized alien workers would continue to have the same protections and remedies (apart from reinstatement when prohibited by federal law) afforded other workers under California's employment and labor laws.  The 2002 legislation, the Legislature said at the time of enactment, is "declaratory of existing law."  (Civ. Code, § 3339, subd. (c); Gov. Code, § 7285, subd. (c); Health & Saf. Code, § 24000, subd. (c); Lab. Code, § 1171.5, subd. (c).)  Focusing on this just quoted language, the Court of Appeal here relied on two Court of Appeal decisions in existence at the time of the 2002 legislation's enactment:  the 1995 decision in *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620 (*Camp*), and the 1998 decision in *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833 (*Murillo*).  The Court of Appeal here read *Camp* and *Murillo* broadly as creating a complete defense based on after-acquired evidence, a view that, according to the Court of Appeal, the Legislature had adopted in enacting Senate Bill No. 1818.

We are not persuaded by the Court of Appeal's reasoning on this point.  Why would the Legislature have focused only on those two Court of Appeal decisions (which provided support for the Court of Appeal's holding here on the issue of after-acquired evidence) while ignoring another Court of Appeal decision, *Cooper*

20

*v. Rykoff-Sexton, Inc.* (1994) 24 Cal.App.4th 614, which held that after-acquired evidence was *not* a defense to a wrongful termination action alleging age discrimination?

Lacking is any indication that when the California Legislature enacted Senate Bill No. 1818 in 2002, it intended to endorse or codify the decisions in *Camp*, *supra*, 35 Cal.App.4th 620, and *Murillo*, *supra*, 65 Cal.App.4th 833, which specifically dealt with the doctrine of after-acquired evidence. No mention of that doctrine appeared in Senate Bill No. 1818.

There is another, more persuasive explanation for the Legislature's statement that Senate Bill No. 1818 is "declaratory of existing law": "[W]here a statute provides that it clarifies or declares existing law, '[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment' " (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244), although such a statement of intent is " 'not binding' " on the courts (*ibid*). Thus, we infer here that the Legislature intended to extend to cases predating Senate Bill No. 1818's enactment that statute's central directive that state law protections should extend to all employees "regardless of immigration status." Nothing in the statute states or implies that its central directive would not apply to any unauthorized alien who used false documentation to obtain employment.

We now consider the applicability here of the doctrine of after-acquired evidence.

### B. After-acquired Evidence

The doctrine of after-acquired evidence refers to an employer's discovery, *after* an allegedly wrongful termination of employment or refusal to hire, of information that would have justified a lawful termination or refusal to hire. (See

21

White & Brussack, *The Proper Role of After-Acquired Evidence in Employment Discrimination Litigation* (1993) Boston College L.Rev. 49; Rubinstein, *The Use of Predischarge Misconduct Discovered After an Employee's Termination as a Defense in Employment Litigation* (1990) 24 Suffolk U. L.Rev. 1.)

Here, plaintiff sued his employer for allegedly violating California's FEHA. During the litigation, defendant employer obtained information suggesting that plaintiff had used another person's Social Security number to obtain employment with defendant. The Court of Appeal agreed with defendant that the after-acquired evidence completely barred plaintiff's claims. Plaintiff challenges that holding, arguing that it fails to give effect to the strong public policies contained in the FEHA.

Pertinent here is the high court's decision in *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352 (*McKennon*), which was cited by both parties and the Court of Appeal. At issue in *McKennon* was whether after-acquired evidence provided a complete defense to an employee's claim that she was terminated in violation of the federal Age Discrimination in Employment Act of 1967 (ADEA; 29 U.S.C. § 621 et seq.). Resolving a conflict among the federal courts of appeals (compare *Summers v. State Farm Mut. Auto. Ins. Co.* (10th Cir. 1988) 864 F.2d 700 with *Kristufek v. Hussmann Foodservice Co.* (7th Cir. 1993) 985 F.2d 364), the high court held that after-acquired evidence does not bar all relief under the federal ADEA, although such evidence can limit the remedies granted to the employee. (*McKennon*, at pp. 361-362.)

*McKennon* observed that the federal ADEA sought to eliminate discrimination in the workplace and that a private litigant seeking redress vindicates the ADEA's important public policy against discriminatory employment practices. *McKennon* reasoned that allowing after-acquired evidence to completely bar relief in such cases would be inconsistent with the federal

22

statutory scheme and would impair the efficacy of the ADEA's enforcement mechanism. (*McKennon*, *supra*, 513 U.S. at pp. 358-359.)

The high court in *McKennon* nevertheless determined that some legitimate concerns of the employer justified taking the employee's wrongdoing into account in fashioning remedies. (*McKennon*, *supra*, 513 U.S. at pp. 360-361.) "In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, or out of concern 'for the relative moral worth of the parties' [citation], but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (*Id.* at p. 361.)

*McKennon* held that, because "the factual permutations and the equitable considerations they raise will vary from case to case," the proper remedial relief would need to be "addressed by the judicial system in the ordinary course of further decisions." (*McKennon*, *supra*, 513 U.S. at p. 361.) The scope of the remedy, noted the high court, generally does not include reinstatement. (*Id.* at pp. 361-362.) With regard to the remedy of backpay, the high court remarked: "Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit. *The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered.*" (*Id.* at p. 362, italics added.) Thus, the high court rejected an "absolute rule barring any recovery of backpay," because such a rule "would undermine the ADEA's objective of forcing employers to consider and examine their motivations, and of penalizing them for employment decisions that spring from age discrimination." (*Ibid.*)

The high court's reasoning in *McKennon* applies with equal force to plaintiff employee's claim here that the employer violated plaintiff's rights under California's FEHA. That state law seeks "to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status." (Gov. Code, § 12920; see *id.*, § 12940, subd. (a) [unlawful employment practice for employer to refuse to hire or to discharge a person on any of these bases].) Achievement of that antidiscrimination goal would be substantially impaired if the doctrine of after-acquired evidence were a complete defense to claims of retaliation and disability discrimination brought under the FEHA. By definition, after-acquired evidence is not known to the employer at the time of the allegedly unlawful termination or refusal to hire. (*McKennon*, *supra*, 513 U.S. at pp. 359-360 [distinguishing after-acquired evidence cases from mixed motive cases in which the employer at the time of the employment action has two or more motives, at least one of which is unlawful].) In after-acquired evidence cases, the employer's alleged wrongful act in violation of the FEHA's strong public policy precedes the employer's discovery of information that would have justified the employer's decision. To allow such after-acquired evidence to be a complete defense would eviscerate the public policies embodied in the FEHA by allowing an employer to engage in invidious employment discrimination with total impunity.

It does not follow, however, that the doctrine of after-acquired evidence has no bearing on employment discrimination and retaliation claims brought under California's FEHA. As the high court observed in *McKennon*, "the lawful prerogatives of the employer in the usual course of its business and the

24

corresponding equities that it has arising from the employee's wrongdoing" are entitled to recognition. (*McKennon*, *supra*, 513 U.S. at p. 361.) In after-acquired evidence cases, therefore, both the employee's rights and the employer's prerogatives deserve recognition. The relative equities will vary from case to case, depending on the nature and consequences of any wrongdoing on either side, a circumstance that counsels against rigidity in fashioning appropriate remedies in those actions where an employer relies on after-acquired evidence to defeat an employee's FEHA claims.

Generally, the employee's remedies should not afford compensation for loss of employment during the period after the employer's discovery of the evidence relating to the employee's wrongdoing. When the employer shows that information acquired *after* the employee's claim has been made would have led to a lawful discharge or other employment action, remedies such as reinstatement, promotion, and pay for periods after the employer learned of such information would be "inequitable and pointless," as they grant remedial relief for a period during which the plaintiff employee was no longer in the defendant's employment and had no right to such employment. (*McKennon*, *supra*, 513 U.S. at p. 362.)

The remedial relief generally should compensate the employee for loss of employment from the date of wrongful discharge or refusal to hire to the date on which the employer acquired information of the employee's wrongdoing or ineligibility for employment.[5] Fashioning remedies based on the relative equities

[5] Defendant employer relies on language by the Court of Appeal in *Farmer Brothers Coffee v. Workers' Comp. Appeals Bd.*, *supra*, 133 Cal.App.4th at page 541, that "backpay is not recoverable by an employee who would not be rehired regardless of any employer misconduct." In support, *Farmer Brothers* cited this court's decision in *Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743 (*Rivcom*). *Rivcom* construed an order of the Agricultural Labor Relations Board directing compensation for losses incurred by employees "as a

*(Footnote continued on next page.)*

25

of the parties prevents the employer from violating California's FEHA with impunity while also preventing an employee or job applicant from obtaining lost wages compensation for a period during which the employee or applicant would not in any event have been employed by the employer. In an appropriate case, it would also prevent an employee from recovering any lost wages when the employee's wrongdoing is particularly egregious.

Here, the trial court initially denied defendant employer's motion for summary judgment because of a triable issue of material fact as to whether defendant employer continued to employ plaintiff worker after being put on notice that his name did not match the Social Security number he had provided. The Court of Appeal concluded there was no triable issue of fact because a mere mismatch could have an innocent explanation and was not necessarily inconsistent with the evidence that defendant employer had a settled policy of refusing to hire applicants who submitted false Social Security numbers.

We agree with the trial court. According to plaintiff's declaration, defendant's production manager, Leo Huizar, after learning that several employees had supplied incorrect Social Security numbers, assured them they would not be terminated as long as the company's president was satisfied with their work. This evidence, if true, would support a finding that defendant employer deliberately chose to look the other way when put on notice of employees' unauthorized status.

---

*(Footnote continued from previous page.)*

result" of unlawful employer conduct as excluding employees who would not have been rehired under a legitimate hiring policy. (*Id.* at pp. 773-774.) But contrary to the broad language used in *Farmer Brothers*, this court in *Rivcom* did not announce a rule that an award of backpay is categorically excluded whenever reinstatement is not allowed as a remedy.

Such a finding could affect application of the after-acquired evidence doctrine and thus the remedies available to plaintiff employee.

We now consider the applicability of the doctrine of unclean hands to such claims.

### C.  Unclean Hands

Generally, the equitable doctrine of unclean hands applies when a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief.  (*Precision Co. v. Automotive Co.* (1945) 324 U.S. 806, 814-815; *General Elec. Co. v. Superior Court* (1955) 45 Cal.2d 897, 899-900; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 9, p. 289.)  " 'The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.' "  (*Camp*, *supra*, 35 Cal.App.4th at pp. 638-639.)  If the required showing is made, unclean hands may be a complete defense to legal as well as equitable causes of action.  (*Mendoza v. Ruesga* (2008) 169 Cal.App.4th 270, 279.)

Equitable defenses such as unclean hands may not, however, be used to wholly defeat a claim based on a public policy expressed by the Legislature in a statute.  (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179; *Mendoza v. Ruesga*, *supra*, 169 Cal.App.4th at pp. 279-280; 13 Witkin, Summary of Cal. Law, *supra*, Equity, § 3, p. 285, § 15, p. 301.)  Nevertheless, equitable considerations may guide the court in fashioning relief in cases involving a legislatively expressed public policy.  This court recognized that when it stated in *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 179: "Although equitable principles may not be applied in opposition to statutory

enactments or to defeat public policy established by the Legislature [citations], such principles have been applied to reduce ordinary tort damages imposed for violation of antidiscrimination laws. [Citations.]"

Accordingly, the Court of Appeal here erred in treating the doctrine of unclean hands as a complete defense to plaintiff's lawsuit, an action founded upon public policies established by the Legislature in the FEHA.

## DISPOSITION

The judgment of the Court of Appeal is reversed, with directions to remand the matter to the trial court for further proceedings consistent with this opinion.

KENNARD, J.*

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

---

*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY BAXTER, J.**

Though with some reservation, I am willing to assume, without deciding, that the majority correctly analyzes how the state law doctrine of after-acquired evidence should apply,[1] in light of Senate Bill No. 1818 (2001-2002 Reg. Sess.) (Senate Bill No. 1818), when a person claims he or she was denied employment for reasons forbidden by California's Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), but the employer later discovers that, in violation of both California and federal law, the person submitted a false Social Security card and number as evidence of eligibility to work in the United States.

However, I disagree with the majority's holding on the separate issue of federal preemption. The majority concludes that federal immigration law preempts an award to an alien employee of "lost wage damages"[2] for wrongful termination under FEHA *only* with respect to a period *after* the previously unaware employer later learns that, by virtue of the worker's federal immigration status, he or she was and is legally ineligible for United States employment. In my

---

[1]    However, I have some reservations about the majority's discussion of the unclean hands doctrine. (See *post*, at p. 7, fn. 4.)

[2]    Like the majority, when I use the terms "lost wages" or "lost wage damages," sometimes also confusingly referred to as "backpay" or "frontpay," I mean wages attributable to a period *after* the employer has discharged or declined to hire or rehire the individual, during which time the person *did not actually* perform work for the employer, and awarded on the premise that he or she would have been working but for the employer's wrongful act.

1

view, a state law rule that allows *any* recovery of post-termination lost wages by an employment-ineligible alien who sought or procured the job by submitting fraudulent eligibility documents, in direct violation of federal law, is foreclosed by the United States Supreme Court's definitive interpretation of federal immigration policy as set forth in the Immigration Reform and Control Act of 1986 (also known as IRCA).

However, the limited record before us does not allow a final application of my legal conclusions to the facts that may or may not exist in this case. Most significantly, while it seems clear plaintiff knowingly submitted a false Social Security card and number when applying for work with defendant, the summary judgment motion failed to establish whether plaintiff is, in fact, an alien ineligible under federal immigration law to be employed in the United States. Accordingly, further litigation of these matters is necessary. Moreover, even if plaintiff is an unauthorized alien who committed immigration fraud to obtain his job, he may still not be preempted from pursuing nonwage remedies for the defendant's wrongful conduct, if any, under FEHA. I therefore agree with the majority that defendant's motion for summary judgment should not have been granted. I explain my conclusions below.

As the majority indicates, in April 2003, plaintiff obtained seasonal employment with defendant by submitting, as evidence of his eligibility to work in the United States, an alien registration card and a Social Security card, both bearing his name. Under penalty of perjury, plaintiff signed Immigration and Naturalization form I-9, on which he entered the number shown on the Social Security card. He also signed Internal Revenue Service form W-4, which included the same Social Security number. Each time he was recalled to work, he used this Social Security number on new I-9 and W-4 forms he signed. No later than early

2005, a letter from the Social Security Administration advised him that his name and Social Security number did not match the agency's records.

In 2006, plaintiff hurt his back while on the job for defendant. Thereafter, defendant failed to recall him for the 2007 season. He sued defendant, alleging that, in violation of FEHA, defendant had refused to rehire him in retaliation for his filing of a worker's compensation claim, and to avoid accommodating his physical disability. Plaintiff sought various forms of monetary recovery, including lost wages.

In the course of pretrial motions, plaintiff acknowledged that it is a state and federal felony, when applying for employment, to use false identification documents to conceal one's true citizenship or resident alien status (18 U.S.C. § 1546(b)(2); Pen. Code, § 114). He stated he intended to testify at trial, and would assert his privilege against compelled self-incrimination if asked about his immigration status. This led defendant to investigate the authenticity of the documents plaintiff had submitted to obtain the job.

Defendant subsequently moved for summary judgment, invoking the doctrines of after-acquired evidence and unclean hands. Defendant asserted that its discovery of plaintiff's fraudulent use of another person's Social Security number entitled it to dismissal of plaintiff's suit as a matter of law.

In support of the motion, defendant submitted evidence that the Social Security number provided by plaintiff belonged to Kelly R. Tenney, a North Carolina resident, who stated that he did not know plaintiff and had given no one permission to use the number. Defendant also submitted the declaration of its president, stating that the company had a long-standing policy of refusing to hire persons who are not legally authorized to work in the United States, and would immediately discharge any employee upon discovering the worker had provided false documents or information to establish such eligibility.

3

In response, plaintiff posited, but proffered no evidence, that the Social Security number he had provided might mistakenly have been assigned to both him and Tenney. Plaintiff did not state that the Social Security card and number were his, or that he believed they were. He made no claims about the authenticity of the alien registration card he had also submitted, and he neither admitted nor denied he was an alien ineligible for United States employment. However, he declared, among other things, that several of his coworkers had received the same Social Security Administration notice he received, and that defendant's production manager, Leo Huizar, assured the group they need not worry about discrepancies in Social Security numbers so long as defendant was satisfied with their work. Plaintiff also stated that, during his years in defendant's employ, he "personally knew several immigrants" also working there, "some of whom admitted to being undocumented workers." According to plaintiff, he "never heard of [defendant] discharging any person due to a discrepancy with a Social Security number, or for any other immigration-related issue."

The trial court initially denied the motion, finding there were triable issues whether (1) plaintiff had fraudulently submitted the Social Security number, or instead whether the same number had mistakenly been issued to two different people; (2) plaintiff was eligible for United States employment based upon his submission of a valid alien registration card; and (3) plaintiff had apprised defendant of the discrepancy notice he received from the Social Security Administration, and if so, whether defendant had acted on this information, or instead had ignored it.

Defendant sought mandamus, and the Court of Appeal issued an alternative writ. In response, the trial court withdrew its order denying the motion for summary judgment, granted the motion, and dismissed the action.

4

The Court of Appeal affirmed. It reasoned that the after-acquired evidence and unclean hands doctrines provided a complete defense to the employer's liability for an allegedly wrongful discharge under FEHA.

The Court of Appeal conceded there was no evidence plaintiff had failed to provide a valid *alien registration* card (a photo identification document which, if valid, suffices to establish both identity and employment eligibility for immigration law purposes).[3] However, the appellate court deemed it undisputed that plaintiff had furnished a false Social Security card and number — an act, the Court of Appeal noted, that (1) was a criminal violation of the federal immigration law, (2) misrepresented a job qualification imposed by the federal government — the possession of a valid personal Social Security number, and (3) exposed defendant to civil and criminal penalties for violation of its obligations under the immigration and tax laws to report its employees' correct Social Security numbers. Because plaintiff's wrongdoing independently justified a refusal to employ him, and would have caused defendant to take this step had it known the true facts, the Court of Appeal concluded he should have no recourse for a failure to rehire that stemmed from other, allegedly forbidden, motives.

The Court of Appeal also dismissed plaintiff's claim he had demonstrated the triability of defendant's policies toward employees and applicants who submitted false documents. The court reasoned that the declaration of defendant's president, to the effect that the company would refuse to hire applicants who were undocumented, or who provided false numbers, was not directly contradicted by Huizar's alleged statement that defendant would overlook *discrepancies* in Social Security numbers, or by plaintiff's declaration that other employees of defendant

_____

[3]      See 8 United States Code section 1324a(b)(1)(B)(ii).)

admitted they were undocumented aliens, and that plaintiff had never heard of any worker being terminated over Social Security or immigration issues.

Finally, the Court of Appeal ruled that application of the after-acquired evidence and unclean hands doctrines to bar plaintiff's recovery was not precluded by Senate Bill No. 1818. This bill inserted, at several places in the codified statutes, a declaration that all worker and employee protections, rights, and remedies provided by California law, "except any reinstatement remedy prohibited by federal law," are available to individuals "regardless of immigration status." (Stats. 2002, ch. 1071, §§ 1-4, pp. 6914-6915.) The Court of Appeal noted that Senate Bill No. 1818 stated it was "declaratory of existing law," and cannot have been intended to immunize undocumented aliens from employer defenses that would apply against all other workers. At the time Senate Bill No. 1818 was enacted, the Court of Appeal asserted, existing case law barred an employee from recovering lost wages for wrongful termination if, as here, he was not legally qualified for the job, was not eligible for reinstatement, or would not have been reinstated in the exercise of legitimate employer prerogatives.

The majority finds this analysis unpersuasive, and would reverse the Court of Appeal. In the majority's view, triable issues remain about whether plaintiff's submission of the false Social Security card and number, if known by defendant, would have caused defendant to terminate plaintiff's employment.

Further, the majority posits, even if defendant would have declined, on this legitimate ground, to hire or retain plaintiff, the after-acquired evidence and unclean hands doctrines generally cannot serve as complete bars to a wrongdoing worker's recovery, under FEHA, when the employer's actual motive was forbidden by the statute. Except in the most egregious cases of employee wrongdoing, the majority concludes, state law makes an employer who terminated a worker for reasons prohibited by FEHA liable to the worker for lost wages

6

attributable to any post-termination period before the employer later discovered legitimate grounds for its action. (See, e.g., *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352, 360-363 [in suit alleging wrongful termination in violation of federal Age Discrimination in Employment Act, employer's post-termination discovery that, while still working, employee had violated company policy by copying and removing confidential documents did not preclude employee's right to recover lost wages for period before employer learned of this independent ground for termination].)[4]

---

[4]     However, to the extent the majority implies that the *unclean hands* doctrine might serve to reduce, but not eliminate, the damages due a worker wrongfully discharged under FEHA whose own later-discovered wrongdoing would have provided legitimate grounds for termination, the majority errs. It is axiomatic that, where applicable, the unclean hands doctrine serves as a *complete* defense to employment-based claims. (Chin, et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2013) ¶ 16:616, p. 16-94.6 (rev. #1, 2013) (Employment Litigation); see, e.g., *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 56 ["Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action."].)

Thus, if equitable considerations "such as unclean hands" (maj. opn., *ante*, p. 27) cannot completely bar a claim based on statute or important public policy (see *McKennon v. Nashville Banner Publishing Co.*, *supra*, 513 U.S. at p. 360; *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 179), the unclean hands doctrine is inapplicable in such circumstances. Our suggestion in *Angelucci* that unclean hands may sometimes reduce the damages awarded to an employee wrongfully discharged under an antidiscrimination statute (*Angelucci*, *supra*, at p. 179) appears to have been an imprecise reading of *McKennon*; *McKennon* actually rejected the defense of unclean hands under the statute at issue there (*McKennon*, *supra*, at p. 360). However, as *McKennon* also made clear, after-acquired evidence of an employer's legitimate grounds for discharging an employee may nonetheless be considered when fashioning a remedy for unlawful termination in order to "take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." (*Id.* at p. 361; see Employment Litigation, *supra*, ¶¶ 16:616, 16:617, p. 16-94.6 [though unclean hands can only be

*(Footnote continued on next page.)*

The majority further concludes that Senate Bill No. 1818's reference to "existing law" was not intended to endorse, in the immigration context, a broad reading of certain prior cases suggesting that under the after-acquired evidence and unclean hands doctrines, an employee's wrongdoing which would have caused his or her legitimate termination bars a claim of wrongful termination. Observing that the legislative history of Senate Bill No. 1818 does not mention these prior decisions, the majority suggests that the more likely purpose of the "existing law" language was to extend to then-pending cases the bill's "central directive" that full state law employment protections should apply to all employees "regardless of immigration status." (Maj. opn., *ante*, at p. 21.)

But before discussing these state law issues, the majority addresses a "threshold issue" not litigated below — whether a federal immigration statute, IRCA, either completely or partially preempts Senate Bill No. 1818's mandate that all California labor and employment rights and remedies, including those afforded by FEHA, are fully applicable to workers "who are unauthorized aliens." (Maj. opn., at p. 7, fn. omitted.) The majority concludes that IRCA does preclude an unauthorized alien who was wrongfully terminated in violation of FEHA from recovering lost wages for any period *after* the employer subsequently discovered the alien was ineligible for employment under federal immigration law, but does not bar such a recovery for the period *before* the employer learned of the alien's ineligibility.

---

*(Footnote continued from previous page.)*

complete defense to wrongful termination, employee misconduct short of unclean hands may still be a complete or partial defense under after-acquired evidence doctrine].)

8

I have doubts about the majority's analysis of state law — in particular, I question the majority's construction of the "existing law" proviso in Senate Bill No. 1818. However, I decline to draw a final conclusion on that issue at the current stage of this procedurally tangled case, because I am persuaded that the supremacy of federal immigration law may ultimately obviate the recovery the majority would allow. If further litigation proves plaintiff actually is an unauthorized alien who submitted false documentation to prove otherwise, I believe, contrary to the majority, that federal immigration policy will foreclose any recovery by plaintiff of post-termination lost wages under California law. This result, I conclude, is dictated by definitive United States Supreme Court authority.

As the majority acknowledges, under the supremacy clause (U.S. Const., art. VI, cl. 2), federal law preempts and supersedes state law if, among other things, the state law stands as "an obstacle to accomplishing congressional objectives. [Citations.]" (Maj. opn., *ante*, at p. 12.) The United States Supreme Court has told us, in no uncertain terms, that the award of post-termination lost wage damages to an unauthorized alien worker who procured the job by committing criminal immigration fraud presents just such an unacceptable obstacle.

In *Hoffman Plastic Compounds, Inc. v. NLRB* (2002) 535 U.S. 137 (*Hoffman*), the National Labor Relations Board (NLRB or Board) found that, in 1992, Hoffman Plastic Compounds, Inc. (Hoffman), a custom formulator of industrial and pharmaceutical chemical products, had committed an unfair labor practice under the National Labor Relations Act (NLRA) by terminating Jose Castro and several other workers in retaliation for their union organizing activities. As remedies, the Board ordered Hoffman, among other things, to offer

9

reinstatement and backpay (i.e., post-termination lost wages) to the affected employees.

At a subsequent compliance hearing, Castro disclosed that he was an alien who had never been authorized to work in the United States. Castro further indicated that he had gained employment with Hoffman by proffering a birth certificate belonging to a Texas-born friend, and that he had also used this certificate to fraudulently obtain a Social Security card. Based on this evidence, the administrative law judge (ALJ) found that the Board was precluded from awarding reinstatement or backpay to Castro.

Several years later, the Board reversed the ALJ on the issue of Castro's backpay. The Board concluded that " 'the most effective way to accommodate and further the immigration policies embodied in [IRCA] is to provide the protections and remedies of the [NLRA] to undocumented workers in the same manner as to other employees.' [Citation.]" (*Hoffman*, *supra*, 535 U.S. at p. 141.) Accordingly, the Board ruled that Castro was entitled to some $67,000 in backpay, plus interest on that principal amount. The court of appeals enforced the Board's order.

The United States Supreme Court reversed. At the outset, the majority noted that the NLRB's authority to remedy unfair labor practices, though broad, is not unlimited where "the Board's remedial preferences . . . potentially trench upon federal statutes and policies unrelated to the NLRA." (*Hoffman*, *supra*, 535 U.S. at p. 144.)

The *Hoffman* majority explained that, in *Sure-Tan, Inc. v. NLRB* (1984) 467 U.S. 883— at a time when federal immigration law did not expressly prohibit unauthorized aliens from working or being hired while present in this country, and was only " ' "peripheral[ly]" ' " concerned with their employment here — the court had nonetheless precluded the NLRB from unconditionally ordering

10

reinstatement of undocumented alien employees who had since voluntarily left the country. (*Hoffman*, *supra*, 535 U.S. at p. 144.) So as to not "effectively [reward] a violation of the immigration laws by reinstating workers not authorized to re-enter the United States" (*id.*), *Sure-Tan* had required that an award of reinstatement in such cases be conditioned on proof of the workers' legal reentry. Moreover, the court had reasoned in *Sure-Tan*, these employees " 'must be deemed "unavailable" ' " for work, and backpay could thus not be awarded, with respect to any period in which such persons " 'were not lawfully entitled to be present and employed in the United States.' " (*Hoffman*, *supra*, at p. 145.)

In *Hoffman*, the Board argued that the *Sure-Tan* limitations applied only to undocumented aliens who had left the United States and thus could not claim reinstatement or backpay without legal reentry. But whatever isolated passages in *Sure-Tan* might support that conclusion, the *Hoffman* majority observed, "the question presented here [is] better analyzed through a wider lens, focused as it must be on a legal landscape now significantly changed." (*Hoffman*, *supra*, 535 U.S. at p. 147.) Whether or not, at the time of *Sure-Tan*, the Board might be required to yield "where . . . [its] chosen remedy trenches on a federal statute or policy outside [that agency's] competence to administer," said the *Hoffman* majority, "[such] is precisely the situation today." (*Hoffman*, *supra*, at p. 147.)

As the *Hoffman* majority recounted, "two years after *Sure-Tan*, Congress [had] enacted IRCA, a comprehensive immigration reform scheme [that] prohibit[s] the employment of illegal aliens" and " 'forcefully' [makes] combating [such] employment . . . central to '[t]he policy of immigration law.' [Citation.]" (*Hoffman*, *supra*, 535 U.S. at p. 147.) "[C]ritical" to enforcement of the prohibition, the court noted, is an "extensive . . . verification system . . . designed to deny employment to aliens" not legally present or "authorized to work" in this country. (*Ibid.*) Under this system, an employer must verify the identity and

11

eligibility of all potential new hires by examining specified documentation.  An employer that hires an alien applicant who is unable to present such documentation, or otherwise knowingly employs an ineligible alien, is subject to civil and criminal penalties.

To ensure the effective confirmation of an applicant's authorization to work in this country, the *Hoffman* majority pointed out, IRCA "makes it a crime for an unauthorized alien to subvert [this] verification system by tendering fraudulent documents.  [Citation.]" (*Hoffman*, *supra*, 535 U.S. at p. 148.)  "[The statute] thus prohibits aliens from using or attempting to use 'any forged, counterfeit, altered, or falsely made document' or 'any document lawfully issued to or with respect to a person other than the possessor' for purposes of obtaining employment in the United States.  [Citation.]  Aliens who use or attempt to use such documents are subject to fines and criminal prosecution.  [Citation.]" (*Ibid.*)

"Under the IRCA regime," the *Hoffman* majority explained, "it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies.  Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations.  The Board asks that we overlook this fact and allow it to award backpay to an illegal alien *for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud*.  We find, however, that *awarding backpay to illegal aliens runs counter to policies underlying IRCA*, policies the Board has no authority to enforce or administer.  Therefore, as we have consistently held in like circumstances, the award lies beyond the bounds of the Board's remedial discretion." (*Hoffman*, *supra*, 535 U.S. at pp. 148-149, italics added.)

12

The Board urged that a limited backpay award — one confined to the period before the employer learned of Castro's illegal status — would reasonably accommodate IRCA, because during the prediscovery period, the employer would not have violated IRCA by retaining Castro in its employ, and because IRCA does not expressly prohibit the recovery of backpay by illegal aliens who misused documents to procure their jobs. The *Hoffman* majority rejected this argument. "What matters here," the majority declared, "and what sinks both of the Board's claims, is that Congress has expressly made it criminally punishable for an alien to obtain employment with false documents. There is no reason to think that Congress nonetheless intended to permit backpay where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading immigration authorities. Far from 'accommodating' IRCA, the Board's position, recognizing employer misconduct but discounting the misconduct of illegal alien employees, subverts it." (*Hoffman*, *supra*, 535 U.S. at pp. 149-150, fn. omitted.) Indeed, the *Hoffman* majority asserted, such a backpay award "not only trivializes the immigration laws, it condones and encourages future violations" by creating incentives to remain and work in this country illegally. (*Id.*, at p. 150.)

"We therefore conclude," the *Hoffman* majority declared, "that allowing the Board to award backpay to illegal aliens would *unduly trench upon explicit statutory prohibitions critical to federal immigration policy*, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board's discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to allow this sort of an award." (*Hoffman*, *supra*, 535 U.S. at pp. 151-152, italics added.)

13

Thus, after considering the issue at length, the high court has made crystal clear that federal immigration policy, as set forth in IRCA, is critically undermined by the award of post-termination lost wages to an alien who is not legally present or authorized to work in this country, and who committed criminal immigration fraud to obtain the job, even when the alien was wrongfully terminated in violation of another law generally intended for the protection of workers' rights. The conclusion follows inescapably, under the federal supremacy clause, that California cannot authorize such an award, for it would " 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . .' [citations]." (*Arizona v. United States* (2012) ___ U.S. ___, ___ [132 S.Ct. 2492, 2501].)

The instant majority struggles mightily to avoid this result. In the majority's view, we may disregard *Hoffman* for purpose of preemption analysis because (1) *Hoffman* concerned only the interplay of two federal statutes, and said nothing about IRCA's preemptive effect on state worker protection laws; (2) Congress has not expressly precluded all state laws concerning undocumented aliens, or so occupied the field as to dictate such preclusion; (3) there is a presumption against preemption in areas of traditional state regulation, such as the protection of workers; and (4) the NLRA, the statute at issue in *Hoffman*, does not rely, for enforcement, on private suits for damages to the same extent as does California's antidiscrimination statute, FEHA.

Then, as if *Hoffman* did not exist, the majority reweighs the concerns that led the *Hoffman* majority to its ruling. Contrary to *Hoffman*, the instant majority concludes that a rule *allowing* a criminally fraudulent unauthorized alien to collect wrongful-termination lost wage damages will have but a "minimal" effect on IRCA's policies (maj. opn., *ante*, at p. 18), while *failing* to allow such a recovery against an employer who wronged the worker under another statute would

14

"frustrate rather than advance the policies underlying federal immigration law" (*id.*, at p. 19). In effect, the majority rejects the highest federal tribunal's assessment of what would unacceptably undermine Congress's immigration purposes and priorities, in favor of its own views on that subject.

None of this is persuasive. Whatever distinctions exist between the NLRA and FEHA, and between tension among federal policies on the one hand, and competing state and federal policies on the other, any such differences are insignificant for purposes of the issue before us. The United States Supreme Court — the final judicial authority on the meaning and scope of federal statutory law — has told us of a particular situation in which a legislative policy of worker protection must yield to the overriding aims of the federal immigration statutes. It has said specifically that awarding post-termination pay to an illegal alien for "work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud" (*Hoffman*, *supra*, 535 U.S. at p. 149) "runs counter to policies underlying IRCA" (*ibid.*) and "would trench upon explicit statutory provisions critical to federal immigration policy" (*id.*, at p. 151).

These are declarations strong and clear enough to prevail over California's expression of its sovereign right and intention to protect unauthorized alien workers, and over any presumption against federal preemption of such a purpose. The high court's statements signal that any such award stands as an obstacle to the full accomplishment of Congress's aims, and is thus preempted. Even if the instant majority finds *Hoffman*'s analysis unconvincing, it is not the majority's place to reject that analysis.

Thus, just as, in *Hoffman*, IRCA's policies were beyond the NLRB's "authority to enforce and administer" (*Hoffman*, *supra*, 535 U.S. at p. 149), so too are those policies beyond the administration and enforcement authority of this

15

state and its laws.  And just as the NLRB's authority, however broad, "to fashion remedies when dealing only with the NLRA" did not extend to an award that trenched upon an immigration statute beyond the Board's jurisdiction (*id.*, at p. 152), so too, this state's undoubted authority to fashion remedies for violations of FEHA, when that statute is considered in isolation, does not extend to awards that would have, as the high court has concluded, a deleterious effect on a federal immigration statute beyond California's jurisdiction.[5]

I therefore find it manifest that California cannot award, as a remedy for wrongful termination under FEHA, lost wage damages to an alien who is unauthorized to work in this country, and who obtained the job at issue by submitting fraudulent eligibility documentation in direct criminal violation of federal immigration law.  California cannot dictate otherwise through the adoption of a statute such as Senate Bill No. 1818.  Thus, if further litigation establishes that this is plaintiff's situation, I believe his recovery of such lost wages attributable to any period after he was terminated from his employment will be preempted and barred.[6]

---

[5]     Of course, the NLRA, the statute at issue in *Hoffman*, contains no express provision, similar to that in Senate Bill No. 1818, that its protections extend fully to workers "regardless of immigration status."  If the NLRA did include such a declaration of *Congress's* purpose, it might well have been held to prevail over the more general immigration principles the high court discerned in IRCA.  But this does not mean *California* can effectively enact a statute that trumps those federal principles.

[6]     The majority in *Hoffman* squarely held that even if the employer's motives for terminating an employee were wrongful under a law unrelated to the worker's immigration status, a remedial award of lost wages for work not performed, to an unauthorized alien who obtained the employment by submitting fraudulent documentation in criminal violation of IRCA, and was never entitled to the job in the first place, unacceptably undermines the policies underlying this federal law. It does appear that in *Hoffman*, the employer was not aware of the employee's fraud and unauthorized alien status until after it fired him for union activity in

*(Footnote continued on next page.)*

16

I stress the narrow scope of my conclusions. I go no further than the high court did in *Hoffman*. I do not suggest, for example, that California is federally barred from enforcing the right of an unauthorized alien worker, even one who obtained the job by fraud, to recover unpaid wages for work actually performed, or from extending to unauthorized aliens, even those who misrepresented their immigration status, the remedies it affords to workers *who were injured or wronged while performing the work they were hired to do*. *Hoffman* did not address those situations, and logical distinctions between those cases, and the one at issue here, come easily to mind. *Hoffman* concluded that federal immigration policy is undermined when an alien who is unauthorized for employment, and who obtained it by criminal means, seeks *unearned wages* for *being terminated from* the job he or she was never entitled to have, and for work he or she thus *did not* perform. It is reasonable to conclude that such a claim, if honored, more directly and unjustifiably rewards the alien's unauthorized and fraudulently procured employment, contrary to IRCA's aims, than does a claim based on fair and just compensation under state law for injury sustained on the job itself.[7]

---

*(Footnote continued from previous page.)*

violation of the NLRA. (*Hoffman*, *supra*, 535 U.S. at p. 141; see also *id.*, at p. 155 (dis. opn. of Breyer, J.).) But the *Hoffman* majority gave no dispositive effect in its analysis to the *employer's* compliance or noncompliance with IRCA, even though the dissent specifically urged the relevance of this factor (*Hoffman*, *supra*, at pp. 155-156 (dis. opn. of Breyer, J.)). I therefore do not read the rule of *Hoffman* to apply only to IRCA-compliant employers, though some post-*Hoffman* decisions in other jurisdictions have inferred such a corollary. (See fn. 5, *post*.) Employers who illegally hire unauthorized aliens are, of course, subject to substantial penalties under IRCA itself. (See 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii), (5).)

[7]    The most pertinent post-*Hoffman* out-of-state decision disclosed by my research is in general accord with my conclusion. In *Crespo v. Evergo Corp.* (N.J.Super. 2004) 841 A.2d 471, the court held that, under *Hoffman*, an

*(Footnote continued on next page.)*

17

*(Footnote continued from previous page.)*

unauthorized alien worker who submitted fraudulent documentation to an unaware employer to obtain the job, and then, in violation of a state antidiscrimination law, was terminated after taking maternity leave, could not recover lost wage or other monetary damages arising from the wrongful termination. (*Crespo*, *supra*, at pp. 473-476.) *Crespo* limited its holding to recovery specifically sought as damages for *loss* of a position to which the alien was never entitled, and left open the possibility that IRCA would permit an unauthorized alien worker's monetary recovery under state law for employment-related physical injury or other wrongs he or she suffered *while on the job*. (See *id.*, at pp. 475-476.) Post-*Hoffman* cases from other jurisdictions have reached varying conclusions as to whether the rationale of *Hoffman* completely or partially bars unauthorized alien workers from compensation for employer safety violations, workplace injuries, or other tortious harm affecting a worker's earning capacity. (See, e.g., *Madiera v. Affordable Housing Foundation, Inc.* (2d Cir. 2006) 469 F.3d 219, 231-232 [where employer, not undocumented alien worker, was in violation of IRCA, and jury was instructed to consider alien's deportability, federal immigration law did not absolutely bar worker injured in worksite accident from recovering tort-based future earnings damages at United States rates]; *Majlinger v. Cassino Contracting Corp.* (N.Y.App.Div. 2005) 802 N.Y.S.2d 56, 61-64 [IRCA did not bar subcontractor's undocumented alien employee from recovering against employer, contractor, or site owner for workplace injury], but see *id.*, at p. 66 [noting plausible distinction between wrongful termination case, where "employer unwittingly had a valid reason for taking precisely the action it took," and case of workplace injury, where employer had no right whatsoever to withhold safety devices required by state law]; *Correa v. Waymouth Farms, Inc.* (Minn. 2003) 664 N.W.2d 324, 329 [IRCA did not preempt states' rights to award worker's compensation benefits]; compare with, e.g., *Wielgus v. Ryobi Technologies, Inc.* (N.D.Ill 2012) 875 F.Supp.2d 854, 862-864 [predicting Illinois Supreme Court would conclude, under *Hoffman*, that undocumented alien injured in workplace accident by allegedly defective product may recover damages for lost earning capacity only at rates applicable to country of origin, not at United States rates]; *Veliz v. Rental Service Corp. USA, Inc.* (M.D.Fla. 2003) 313 F.Supp.2d 1317, 1335-1336 [under *Hoffman,* lost United States wages could not be recovered in tort on behalf of unauthorized alien who, having procured employment by submitting fraudulent papers, was killed in workplace forklift accident]; *Rosa v. Partners in Progress, Inc.* (N.H. 2005) 868 A.2d 994, 998-1002 [unauthorized alien who committed fraud to obtain employment generally may recover tort-based earning capacity damages for workplace injury only at rates applicable to country of origin, since United States earnings would have continued only by virtue of illegal employment, but employer

*(Footnote continued on next page.)*

Nor do I foreclose the possibility that a criminally fraudulent unauthorized alien worker who was wrongfully terminated in violation of FEHA may nonetheless be able to pursue other remedies available under this statute. Such remedies might include injunctive relief, costs and attorney fees, and even exemplary damages intended not as compensation to the worker for loss of the job, but purely as a sanction against an employer whose malice is established. These, too, are issues not addressed in *Hoffman*, and they do not as directly implicate the high court's concern that such a worker not be allowed to recover post-termination *earnings* for a job to which he or she was never entitled.[8]

As I have indicated above, it appears clear from the instant record that plaintiff used a false Social Security card and number to obtain employment with defendant, but the evidence on summary judgment does not establish whether plaintiff is actually an alien unauthorized to work in the United States. Because application of the preemption rule I derive from *Hoffman* depends on a determination of that issue, and because plaintiff's immigration status may not necessarily bar him from pursuing a FEHA claim in some form, I concur in the reversal of the summary judgment for defendant.

BAXTER, J.

I CONCUR:

CHIN, J.

---

*(Footnote continued from previous page.)*

who hired alien in violation of IRCA's knowledge or verification requirements cannot bar alien's recovery at United States rates].)

[8] In addition to a claim for lost wages, plaintiff's amended complaint also includes a prayer for exemplary damages, "general damages," and "such other and further relief as is just."

19

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Salas v. Sierra Chemical Co.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 198 Cal.App.4th 29
**Rehearing Granted**

_____

**Opinion No.** S196568
**Date Filed:** June 26, 2014
_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Elizabeth Humphreys

_____

**Counsel:**

Pine & Pine, Norman Pine; The Legal Aid Society-Employment Law Center, Christopher Ho, Araceli Martínez-Olguín, Marsha J. Chien; Rancaño & Rancaño, David Rancaño; Stevens Law and Margaret P. Stevens for Plaintiff and Appellant.

Cynthia L. Rice, Kate Hegé and Julia L. Montgomery for California Rural Legal Assistance, Inc., California Rural Legal Assistance Foundation, The Asian Law Caucus, Inc., Asian Pacific-American Legal Center of Southern California, Golden Gate Women's Employment Rights Clinic, Legal Aid of Marin, Worksafe, Inc., Centro de los Derechos del Migrante, Inc., California Employment Lawyers Association, Labor and Employment Committee of the National Lawyers Guild, UFCW Local 5, SEIU Local 1021 and SEIU-USWW as Amici Curiae on behalf of Plaintiff and Appellant.

Julia Harumi Mass; Jennifer Chang Newell, Taylor & Company Law Offices, Stephen E. Taylor, Stephen McG. Bundy and Joshua R. Benson for The American Civil Liberties Union, American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California and American Civil Liberties Union of San Diego and Imperial Counties as Amici Curiae on behalf of Plaintiff and Appellant.

Della Barnett, Michael Caesar; Eunice Hyunhye Cho; Linton Joaquin, Karen C. Tumlin and Josh Stehlik for Impact Fund, National Employment Law Project, National Immigration Law Center, Bet Tzedek, Community Legal Services in East Palo Alto, Coalition for Humane Immigrant Rights of Los Angeles, Disability Rights Education & Defense Fund, Disability Rights Legal Center, Dolores Street Community Services, Immigrant Legal Resource Center, Immigration Center for Women and Children, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Public Advocates, Inc. Public Counsel and Public Law Center as Amici Curiae on behalf of Plaintiff and Appellant.

Beeson, Tayer & Bodine and Jason Rabinowitz for Raquel Aldana, Keith Cunningham-Parmeter, Ruben Garcia, Kate Griffith and Leticia Saucedo as Amici Curiae on behalf of Plaintiff and Appellant.

**Counsel:**

William A. Herreras; Remcho, Johansen & Purcell, James C. Harrison and Margaret R. Prinzing for California Applicants' Attorneys Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Freeman D'Aiuto Pierce Gurev Keeling & Wolf, Freeman Firm, Arnold J. Wolf, Thomas H. Keeling and Michael N. Morlan for Defendant and Respondent.

Proskauer Rose and Harold M. Brody for Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher Ho
The Legal Aid Society-Employment Law Center
180 Montgomery Street, Suite 600
San Francisco, CA  94104
(415) 864-8848

Arnold J. Wolf
Freeman Firm
1818 Grand Canal Boulevard, Suite 4
Stockton, CA  95207
(209) 474-1818